ARKANSAS POLLUTION CONTROL COMMISSION
v. CHARLES W. COYNE, DOYLE SHIRLEY, JR., AND
RAYMOND DONATHAN

5-5890                                    481 S.W. 2d 322

Opinion delivered June 12, 1972

*James M. McHaney,* for appellant.

*Robert D. Ridgeway* and *House, Holmes & Jewell,*
by: *Philip E. Dixon,* for appellees.

CARLETON HARRIS, Chief Justice. The Arkansas Pollu-
tion Control Commission issued an order on April 23,
1971, wherein it refused to approve the use of septic
tanks as a private sewage disposal system for eight
houses proposed to be constructed by appellees, Charles
W. Coyne, Doyle Shirley, Jr., and Raymond Donathan,
on certain lots owned by appellees in unsewered areas in
Hot Springs. On appeal to the Circuit Court of Garland
County, the order of the commission was set aside by
that court, the court holding that the commission had

acted in an arbitrary and unreasonable manner in disapproving the applications. From the circuit court judgment, the commission brings this appeal. For reversal, it is simply asserted that the order of the commission was supported by substantial evidence and was not arbitrary and unreasonable.

As background to this litigation, it might be stated that the commission is a state agency created by the Arkansas Water and Air Pollution Control Act, Ark. Stat. Ann. § 82-1901 et seq (Supp. 1971), and is vested by this Act with broad regulatory quasi-judicial authority and discretion in formulating and applying appropriate remedial measures to prevent pollution. The authority of the commission to act is not questioned in this litigation; rather, it is only asserted that it acted in an arbitrary and unreasonable manner. According to the evidence, 60% of the area within the city limits of Hot Springs is without any public sewer service and it was this situation that culminated in an order on March 27, 1970, by the commission against the city, which *inter alia,* provided that the city of Hot Springs:

> "Shall not issue a building permit for any structures in any unsewered area within the City limits unless the private sewage system for said structure has been first approved in writing by the Arkansas State Board of Health. [1] It is further ordered and directed that the City of Hot Springs shall not approve, allow, or permit the platting or constructing of any subdivisions, residential or industrial, within the City limits, or within five miles thereof unless the sewer collection and treatment system for such proposed subdivision has been first approved in writing by the Commission and a permit issued therefor. The Commission will consider a petition to rescind or modify the foregoing restrictions at such time as the City of Hot Springs can show that its sewer collection system has been repaired or replaced so that the design capacity of its existing sewage treatment plants is

---

[1]Because of insufficient personnel, the Board of Health was unable to fully comply with this duty, and same is handled by the commission.

not being exceeded and at such time as the City of Hot Springs has officially adopted and filed with the Commission an acceptable comprehensive plan for collecting and treating its sewage in a manner adequate to prevent pollution of any waters of the State, including specifically Lake Hamilton and Lake Catherine, and a permit has been issued by the Commission therefor, and the City has effectively appropriated funds for such initial phase of construction as shall be approved by the Commission."

This order was not appealed from and became final.

In that area of the city not sewered, individual sewage disposal systems (septic tanks) are principally in use[2]

---

[2]In March, 1965, Hollis B. Conway, a sanitation engineer for the Federal Housing Administration, made a report to the office of the FHA director in Little Rock setting out results of an investigation made relative to individual sewage disposal systems in Hot Springs. The report, *inter alia,* stated:

"In September and October, 1964 and January, 1965, visits were made to the Hot Springs area to survey the unsewered area to ascertain if individual sewage disposal systems were operating satisfactorily. *** It was learned that the Stokes Creek watershed in the southwest part of the city has no sewer system. In 1952, the City proposed to sell $200,000 worth of bonds to install sewers in the area, but residents did not form the necessary district. Nothing has been done since. *** The soil in the Hot Springs area is primarily broken shale underlaid with a layer of shale or rock. This underlayment may be in various planes depending upon the heave or fold at the time of the mountainous formation. Survey of areas in and around Hot Springs revealed many individual sewage disposal system failures. [There follows a recitation of numerous instances of septic tank failures]. *** Where shale layers outcrop or in low areas, evidence of septic tank system effluent is present. It appears that the broken shale allows the system effluent to percolate to the impervious stratum, then run along the stratum to its outcropping. It is my opinion that septic tank systems will not function properly in a majority of the area in and around Hot Springs. Septic tank systems should not be used where a concentration of houses are built. It is recommended that the Commissioner's risk not be extended in the Hot Springs area. New construction to be served by septic tank systems should not, in my opinion, be considered acceptable. Properties even though served by the Municipal Sewage System should be investigated it they are located near an area which is served by septic tank systems. Drainage from the septic tank system area might be into the area served by sewers. ***"

and the applications of persons applying to the city for building permits have been forwarded on to the commission with applications for use of septic tanks. These were reviewed by H. G. Hannah, Chief Engineer of the commission, who either approved or denied such applications. [3]

The principal regulation with which compliance is required before approval to install a septic tank is Bulletin No. 9, pertinent portions of which read as follows:

"The first procedure in the design of sub-surface sewage-disposal systems is to determine suitability of the soil for the absorption of septic tank effluent and the leaching area required. The soil must have an acceptable percolation rate, without interference from ground water or impervious strata below the level of the absorption system. ***

(2) The maximum elevation of the ground-water table should be at least 4 feet below the surface. Rock formations or other impervious strata should be at a depth greater than 4 feet below the bottom of the trench.

Unless these conditions are satisfied, the site is unsuitable for a sub-surface sewage disposal system, except for isolated systems, which shall be considered

This recommendation was followed by the Federal Housing Administration and it has since refused to approve loans made on the construction of new residences in unsewered sections of Hot Springs.

L. D. Cockman, Assistant Director of the Arkansas Pollution Control Commission, testified at the February 27, 1970, hearing (order entered the following March) relative to the coliform bacteria counts in Lake Hamilton, Lake Catherine, Hot Springs Creek, Gulpha Creek, and Stokes Creek. Without detailing the report, suffice it to say that it reflects a highly undesirable condition. Mr. Cockman testified that soil conditions in general are not suitable for subterranean disposal such as a septic tank system, mainly because the soil is generally clay underlayed by shale or other types of rock which are most unsatisfactory for this type of disposal.

[3] As of the date of the commission hearing in this case, the city had forwarded 56 requests for use of septic tanks of which 19 had been approved by the commission.

individually and have the approval of the State Department of Health.

2.2 Percolation tests. Sub-surface explorations are necessary to determine sub-surface formations and to determine the suitability of the soil for a septic tank system. A soil auger, with an extension, is recommended for making investigations. In some cases an examination of road cuts, stream embankments, or building excavations will give useful information. Wells and well-driller's logs can be used to obtain information on ground water and sub-surface conditions. In some areas sub-soil strata vary widely in short distances and borings must be made at the site of the system. ***

23.2 Type of test holes. Dig or bore a test hole with horizontal dimensions of from 4 to 12 inches, and vertical sides to the depth of the bottom of the proposed absorption trench (24 inches or more). The holes may be bored with a 4-inch auger."

There is no contention that the requirements of this bulletin are difficult to comply with, or even that they are unreasonable. To the contrary, it is argued by appellees that they complied with Bulletin No. 9, and that their applications to install septic tanks were refused on the basis of requirements and standards not set forth in the bulletin; that such action was unreasonable and arbitrary. Ray Schneller, Director of Engineering and Planning of the City of Hot Springs, and Charles Summerford, a consulting engineer of Hot Springs and his partner, Wayne Irwin, all testified on behalf of appellees, and all stated that the results of percolation tests on the 8 applications met the requirements set out in Bulletin No. 9 (and this is pretty well agreed to by appellant's witnesses), and in their argument, appellees repeatedly assert that Bulletin No. 9 has been complied with. We disagree. A reading of the requirements in that bulletin, heretofore set out, establishes improtant requirements other than the percolation tests. We refer to (2) which refers to the maximum elevation of the ground-water table. Admittedly, appellees' engineers did not go below 2 feet in making their tests, despite the fact that evidence

of shale[4] was found in all three of the sub-divisions here involved. In other words, there is no showing in any of the 8 applications reflecting that there are no rock strata for a depth of 6 feet.

Irwin testified for appellees and stated that the percolation test holes were dug with posthole diggers; that in some instances solid rock was encountered from 6 to 12 inches down; if solid rock was encountered, they proceeded no further with the tests. He further stated that on encountering shale in excavating for percolation test holes, it was felt that if the shale could be dug with a posthole digger, it was not necessary to dig deeper. Summerford admitted that septic tanks are not ideal because there are any number of things that can go wrong with the tanks that create problems:

"I don't think that septic tanks is the—is the best method that there is, no sir, I—as a matter of fact, I think that in my opinion, a municipal sewer system with a properly operated collection system and disposal is the preferred method by far, any number of things can go wrong with septic tanks that create problems—they are expensive to the owners in maintaining—not only from roots but stop ups and other problems. They're more prone to—to maintenance problems than—I think a—municipal system is, and I personally don't think too much of a septic tank."

Mr. Hannah testified that shale was evident in all the areas for which there were applications. [5] As to the lots

[4]Shale is defined by Webster's Third New International Dictionary as "A fissile rock that is formed by the consolidation of clay, mud, or silt, has a finely stratified or laminated structure parallel to the bedding, and is composed of minerals that have been essentially unaltered since desposition." Summerford testified that shale is "actually a material that is formed by heat and pressure in the earth's crust more or less from sediments in an area. Now shale here as so indicated. to me simply means a low quality rock or grandular material that is present in these conditions. I mean in these locations." He reiterated "Yes, it is a rock".

[5]On rebuttal, Charles Coyne and Doyle Shirley each testified that on one of each man's lots most of the shale along the curb line had been hauled in as back-fill.

belonging to Coyne, located in Cedarwood North sub-division, he stated:

"Of Cedarwood North—there was shale evident in all the cuts along the road side. On the second and third inspections, there was evidence of a seepage from a drainage ditch coming down through there; in fact looked like a wet-weather spring, it did not appear to be a water line leak. There was iron particles, it was heavy iron water. There was development in there, something like—50% development of the area. Generally the drainage conditions weren't good, essentially the same conditions were evident on Lot number 4 of Block 1."

Further, "It [shale] was in the cuts from the curb on the street. It was in the utility cuts that had been made. It was broken and fractured but showed evidence of having been laminated." When asked about the significance of the laminated shale as far as approval or disapproval of a septic tank system is concerned, Hannah replied:

"Well, in this particular type, your effluent can get into these laminations and the material will weather, just as it had out there in the ground, or had on the ground, and you will get effluent running through the layer rather than being absorbed into the ground as is the proper function of a septic tank. Well, it's a very low degree of treatment—it acts as a sedimentation chamber with some anerobic biological action, the effluent from this, which I say is—is a very low degree of treatment, then goes into a leaching field where it is absorbed into the ground and if properly constructed should never surface and consequently the low degree of treatment has been acceptable when properly done."

The engineer said that the proximity of other dwellings and the character of the surrounding area were also factors that he considered in denying the applications; that there was a great difference in approving the use of septic tanks in an isolated area where there is a large plot of ground and approving the use of a septic

tank in an urban built up area. The disapproval of the applications of the other two appellees was made on the same basis. He mentioned, relative to Shirley, that there were several other houses down stream on a very steep slope.

Cecil Weir, employed by the Arkansas State Department of Health as an engineer, agreed that Hannah was completely justified in his decision denying the applications. Making reference to requirement (2) from Bulletin No. 9 referring to the maximum elevation of the ground-water table, Weir stated:

"When you have, if you have shale, now our regulations says four feet below the trench or six feet deep as far as there shall be no rock or impermeable layer. In other words, clay or something like which will hold and keep it from traveling on down into the ground. And when you have shale, such as this, and it forms a layer, you may have soil on top that will exhibit good percolation but once it soaks down and hits this layer of shale it can travel along the surface of the shale or along through the shale and come out, well at this ditch cut I'm talking about, can come out at the surface of the ground, if the shale gets that close enough to the surface of the ground come out from the stream bed or anything like that. Now as far as a built up community and as far as using septic tanks in a built up community, we look at the aspect of these, of kids or children that like to play in water and that sort of thing and in cases they like to get out and playing in the back yard or where ever kids like to play and will get into this material. Animals will get into this material and will be brought into the peoples houses and if its septic tank effluent —its a septic tank effluent that these kids are playing in. This is really I think, the most important factor involved with septic tanks in a built up area."

We have not detailed the evidence of appellees for the reason that we are only concerned with whether there was substantial evidence to support the order of the commission. By "substantial", we mean valid, legal, and persuasive evidence. If, of course, such evidence was offered,

it automatically follows that the ruling of the commission would not be unreasonable or arbitrary.

Appellees argue that Hot Springs is the only city in the state wherein the commission has ordered that applications be first submitted to it for approval, and it strongly intimates that the commission has no intention of approving applications in that city until definite steps, which the commission deems necessary, are taken with regard to sewage disposal. As to the first mentioned argument, it does not appear that there are any other areas wherein the problem exists to the extent of requiring written approval by the commission before septic tanks are installed; as to the last, there has been approval of some permits, as earlier pointed out. It is likewise argued that the applications were turned down for reasons other than non-compliance with Bulletin No. 9. Hannah so stated, mentioning proximity of other houses in the vicinity, and character of the surrounding terrain. Of course, it is desirable that criteria and standards for the approval of septic tank applications should be set out in writing, and prospective applicants thus apprised in advance of what would be expected. The additional matters considered by Hannah certainly seem to be pertinent to whether applications should be approved, and were even matters that would not seemingly require expert opinion. Be that as it may, the fact remains that Bulletin No. 9 was *not* complied with as already mentioned and certainly the regulation (2) referred to previously is in black and white, and is actually the first specific requirement in Bulletin No. 9.

We cannot agree that the record reflects any prejudice toward the city on the part of the commission, and it is considered and expected that all applications will be acted upon on an individual basis and approved or disapproved according to the evidence offered. After all, public officers are presumed to act lawfully, sincerely and in good faith in the execution of their duties. *Rockefeller* v. *Hogue,* 244 Ark. 1029, 429 S.W. 2d 85, and cases cited therein.

The people of Arkansas are proud of the health fa-

cilities offered in Hot Springs and desire that its function and reputation as a health resort be maintained.

Despite the fact that an ordinance passed by the City Council calling for a substantial increase in the sewage service charges was defeated after a referral to the people in November, 1969, there is evidence that the people of that community have now become acutely aware of the problem. At the hearing before the commission in February, 1970, a resolution of the "Hot Springs Citizen's Sewer Committee" (composed of 16 citizens) was read into the record. It is pointed out that this committee had recommended an increased sewer tax with a new minimum rate of $1.00 (rather than $.50), and it mentions that the ordinance was adopted. The resolution closed as follows:

"We, of the Citizen's Committee, have pledged ourselves to give these problems not only the very best efforts, to minimize or eliminate the pollution of our most important resource, namely Lake Hamilton and Lake Catherine, but also to work with as much speed as possible.

You, Gentlemen of the Commission are aware, that such a program to solve these problems will take considerable time and while such time has been given the City freely in the past, we wish to assure you that quite a different climate of cooperation exists now in Hot Springs."

The record does not reflect results obtained.

While we recognize that the home building industry can suffer to some degree because of a necessary curtailment in the construction of houses in unsewered areas, we think it clear that when the building of such houses contributes to pollution of the area, the welfare of the citizens of that community, and the thousands of visitors to Hot Springs, demands that the control of contaminated areas take precedence.

The judgment of the Garland County Circuit Court

is reversed and the cause remanded with directions to reinstate the order of the commission.

It is so ordered.

BYRD, J., dissents.

CONLEY BYRD, Justice, dissenting. If the appellant had been denying the applications for permits simply on the basis that the property owners had not complied with Bulletin No. 9, I would agree. The proof however shows that appellant's chief engineer is denying the applications upon some sort of *criteria that are not in print*. This alone is sufficient to show that the Commission was arbitrary.

In addition to the criteria not in print, the proof shows that the applications were made in September, hearings were not held until December and a ruling was not made until the following April. This time element alone is so cumbersome that it becomes arbitrary and capricious. Few people can wait nine months to find out whether they have a job under today's cost of living scale.

Furthermore the undisputed proof in the record is that other houses in the same subdivision are properly operating, pollution free, on septic tanks.

For the foregoing reasons, I respectfully dissent.