LARRY WILLIAMS ET AL *v.* STATE OF ARKANSAS

5786                                    490 S.W. 2d 117

Opinion delivered February 12, 1973

974

*John W. Walker* and *Richard L. Mays,* for appellants.

*Ray Thornton,* Atty. Gen., by: *Kirby Smith III,* Asst. Atty. Gen., for appellee.

JOHN A. FOGLEMAN, Justice. Appellants were found guilty of refusal to assist an officer in violation of Ark. Stat. Ann. § 42-204 (Repl. 1964) and resisting an officer in violation of Ark. Stat. Ann. § 41-2801 (Repl. 1964). They contend that Ark. Stat. Ann. § 42-204 is void on its face, and as applied, in that it offends the Fourth, Fifth, Eighth, Ninth, Thirteenth and Fourteenth Amendments to the United States Constitution and that the evidence is not sufficient to show a violation of Ark. Stat. Ann. § 41-2801. We do not agree with either argument.

As will be noted, the appellants have assaulted § 42-204 by firing a blunderbuss. Some of their arguments seem vague and illusional, but we shall treat them as best we can. The statute reads:

> Every person commanded by a public officer to assist him in the execution of process, who, without lawful cause, refuses or neglects to obey the command, is guilty of a misdemeanor and contempt of the court from which the process issued.

Since this contention relates, in part, to the application of the statute in this particular case, we must review the pertinent evidence in the light most favorable to the state. A Little Rock policeman named Haggard went to the residence of Patricia Ann Smith on November 11, 1971, for the purpose of arresting her on a shoplifting charge on a warrant issued by the Municipal Court of Little Rock. Haggard had attempted to serve the warrant previously, but the woman had run out the back door when he approached the house from the front. The officer had information that Mrs. Smith was at home upon the date of his second effort to make the arrest. He had called for assistance from other officers who were patrolling in the vicinity, so that another officer could watch the back door. When he was unable to locate another nearby officer who was not then occupied on other assignments, he saw the two defendants passing and called them over to his patrol car, in which he, in full uniform, was then seated. Haggard testified that he then explained that he was a police officer, exhibited the warrant to them, stating the charge upon which it was issued and sought their assistance in watching the back door of the house and calling out to him if the occupant of the house started out the back door. Haggard said that appellants both profanely stated that they would not assist a police officer at any time or place, and would not help him if he were lying in the street dying. According to the officer, he explained that there was both a state law and a city ordinance requiring a private citizen to aid a police officer upon the officer's request and that refusal to do so subjected the citizen to arrest for a misdemeanor. Haggard further testified that both appellants then used profane language and started walking away, and he informed them that they were under arrest for refusing to aid a police officer. He related that when they continued to walk away he repeated his statement that they were under arrest, walked up behind the appellants, laid his hands upon their shoulders preparatory to using the force necessary to make the arrest, again told them they were under arrest and that he would have to take them to police headquarters, but that they knocked his hands off their shoulders and continued walking away, so he pulled his pistol out, held it beside him and pushed appellants toward his patrol car, at which time another police officer stopped and stood

by while he completed the arrest. Haggard testified that a companion of the appellants was not arrested because his assistance was not sought.

Williams testified that he neither cursed nor resisted the officer and that he did not know what the paper Haggard exhibited was, but admitted that he knew that Haggard had previously experienced trouble in making the arrest, that he had seen the officer watching shoplifters at a store, and that he had refused to assist Haggard, telling the officer that that was not Williams' job and that Haggard was being paid for doing this job. Williams denied that the officer had advised him that his refusal constituted a violation of state law before their arrival at the jail. He stated that he was afraid the woman might shoot him.

Hooks said that he declined to assist and told the officer that this was not his (Hooks') job and expressed fear that he might be shot and doubt that anything would or could be done about it. Hooks denied that the officer showed him a warrant or told him that his refusal to aid would be a violation of the law.

The posse comitatus has an ancient history. It has been defined as the power or force of the county, consisting of the entire population of the county over the age of 15, which a sheriff may summon to his assistance in certain cases, such as keeping the peace, pursuing and arresting felons, etc. Black's Law Dictionary, Fourth Edition, p. 1324. Its origins are believed to lie in the pre-conquest English statute of "hue and cry," a method then recognized for issuing and enforcing process to bring one committing a crime before the courts, under which one who came upon evidence of a crime was himself guilty of an offense if he failed to raise the "hue" to call out the neighbors to turn out with weapons they were bound to keep. See II History of English Law, Pollock & Maitland, Second Edition, 578, et seq.; *Babington* v. *Yellow Taxi Corporation*, 250 N.Y. 14, 164 N.E. 726 (1928). From this practice, the right of the sheriff to call up the local male population to arrest criminals or prevent riots evolved, and became known as the posse comitatus, which in effect was a civil army to be used by the sheriff for these purposes, among others. Lorence, The Consti-

tutionality of the Posse Comitatus Act, 8 U.M.K.C.L. Rev. 164 (1940). Refusal to render the aid sought by the sheriff was an offense punishable by fine and imprisonment. *Commonwealth* v. *Martin,* 7 Pa. Dist. Rep. 219 (1897); Annot. 44 Am. St. Rep. 136 (1895). See also, 4 Wharton's Criminal Law & Procedure (Anderson) 223, Arrest § 1582.

The criminal nature of refusal to aid an officer in the execution of his duties was recognized in *Regina* v. *Brown,* 41 Eng. Common Law Reports 175 (1841). A constable, acting upon information he had received, discovered an illegal prize fight in progress but, being unable to arrest the participants without a warrant, charged Brown to assist him. It was there said that one duly called upon to render such assistance was not excused except for physical impossibility or lawful excuse. This case has been followed in many American cases, and the practice has been utilized in law enforcement throughout the history of this country, although the necessity for aid to law enforcement officers may have diminished over the years. See Annot., 44 Am. St. Rep. 136 (1895); *Hooker* v. *Smith,* 19 Vt. 151, 47 Am. Dec. 679 (1847); *Babington* v. *Yellow Taxi Corporation,* 250 N.Y. 14, 164 N.E. 726 (1928); 4 Wharton's Criminal Law & Procedure (Anderson) 223, Arrest § 1582. In *Babington,* a police officer jumped on the running board of a cab and ordered the driver to chase another cab in order that its driver might be arrested. In determining the duty of the driver in these circumstances the court relied upon an 1848 New York statute strikingly similar to Ark. Stat. Ann. § 42-204 and reviewed the history of the duty of citizens in such cases. Mr. Justice Cardozo, speaking for the court, said:

> The horse has yielded to the motorcar as an instrument of pursuit and flight. The ancient ordinance abides as an interpreter of present duty. Still, as in the days of Edward I, the citizenry may be called upon to enforce the justice of the state, not faintly and with lagging steps, but honestly and bravely and with whatever implements and facilities are convenient and at hand. The incorporeal being, the Yellow Taxi Corporation, would have been bound to respond in that spirit to the summons of the officer if it had been sitting in the driver's seat. In sending Babington

upon the highway, it knew or is chargeable with knowledge that man and car alike would have to answer to the call.

Without further elaboration, it is sufficient to say that Ark. Stat. Ann. § 42-204 is, at most, an extension of the common law concept of posse comitatus, if not merely a codification thereof. *Hooker* v. *Smith*, 19. Vt. 151, 47 Am. Dec. 679 (1847). See also, *Robinson* v. *State*, 93 Ga. 77, 18 S.E. 1018, 44 Am. St. Rep. 127 (1893).

In Wharton's Criminal Law & Procedure (Anderson), Vol. 4, p. 223, Arrest § 1582, the author states, categorically, but with citation of authorities from five jurisdictions, that every citizen is bound to assist a known public officer in making an arrest, when called upon to do so. He adds, also citing authorities, that any police officer, instead of organizing a formal posse comitatus, may, when he deems it necessary to effect an arrest, summon any bystander to his assistance. See also, 47 Am. Jur. 847, Sheriffs, Police and Constables, § 36; 6 C.J.S. 616, Arrest § 16.

We are unaware of any attack upon the posse comitatus or the statutory enactments pertaining to the use of the power upon constitutional grounds in the history of this country. Not only is there a presumption favoring validity of any statute, every reasonable doubt is resolved in favor of its constitutionality, and the fact that a statute has been in effect over a long period of time without its validity having been questioned, while not conclusive, is highly persuasive of its constitutional validity. *Poole* v. *State*, 244 Ark. 1222, 428 S.W.2d 628; *McEachin* v. *Martin*, 193 Ark. 787, 102 S.W.2d 864. See also, *Swaim* v. *State*, 184 Ark. 1107, 44 S.W.2d 1098. This statute was a part of our Criminal Code, which became effective in 1869. Surely if such statutes as this were in violation of federal constitutional provisions, the thought would have long since occurred to the eminent legal scholars and jurists who have treated the subject.

As we understand appellants' arguments, they say that the act and its application to them violates the Fourth and Fifth Amendments because (1) they were unlawfully seized for undefined police purposes, (2) there was an

invasion by the government of their right of privacy, (3) the officer acted arbitrarily because there was no emergency, and service of the warrant on the misdemeanor charge could have been deferred, the aid of another nearby person was not even enlisted, no other officer was brought by Haggard to assist him, and because the officer could have obtained a court order to effectuate his purpose. We do not hesitate to say that we find no evidence that Officer Haggard acted arbitrarily or recklessly in the premises. He wanted help, he said, because the woman had previously fled, but he did not want to break down the door to effect an arrest of a woman when there were three small children in the house. He only asked that he be warned if she left by the back door. We find no basis for these arguments.

Appellants simply state that the Eighth Amendment is a prohibition against cruel and unusual punishment. We are uncertain whether they contend that the officer's calling upon them to assist was in and of itself cruel or unusual punishment or their punishment by a $25 fine and sentence of 10 days' imprisonment (to be suspended upon payment of the fine) on this charge was cruel and unusual. Nor do we find that the punishment of appellants for "doing nothing" as they put it, in response to the officer's call, is so offensive to a sense of fairness and justice as to be invalid. In any event, we find no violation of this constitutional provision.

We likewise find no merit in appellants' argument that their right to privacy (or "to be let alone") and to freedom of possession and control of their respective persons, free and clear of restraint or interference, unless by clear and unquestionable authority of law, guaranteed by the Ninth Amendment, was invaded. In the first place, any interference with their freedom has been demonstrated to have been by clear and unquestionable authority of law and, in the next, we find no invasion of privacy.

The rejection of the argument, that the statute requires involuntary servitude by requiring one to do police work without compensation or other benefits of employment, requires no discussion, except to say that surely the responsibilities of a citizen in this republic have not been so diminished and diluted that such a theory can be

viewed as having any substance whatever. We cannot see how the possible exposure to danger can be seriously advanced as indicative of involuntary servitude, as suggested by appellants.

It is no defense to a charge of refusal to render aid that the efforts of the person summoned would have been ineffective or unavailing, that obedience involved danger, or that the aid of the citizen called upon was unnecessary, unless the discretion of the officer invoking the aid was recklessly exercised. Annot., 44 Am. St. Rep. 137 (1893); *Dougherty* v. *State,* 106 Ala. 63, 17 So. 393 (1895).

The Fourteenth Amendment is invoked by appellants on the basis that their liberty was taken at the whim of the police officer rather than by due process pursuant to specific, definable standards. They advance the same premises for this contention as they advanced in connection with their assertions with reference to alleged violations of Amendments Four and Five. Let it first be said that the standards for action are adequately prescribed in Ark. Stat. Ann. § 42-202 (Repl. 1964) which authorizes the enlistment of aid in the execution of process when a public officer finds, or has reason to apprehend, that resistance will be made to its execution. Resistance, for the purposes of the statute, need not be by active means. Annot., 44 Am. St. Rep. 136 (1893). It is true that the statute permits the exercise of discretion by the officer and this is in keeping with the history of the posse comitatus and is certainly a necessary feature for its effective and appropriate use. As previously indicated, we do not think that this discretion can be exercised arbitrarily, nor do we find that it was in this case. The argument that the failure to summon another bystander deprived appellants of due process and rendered the officer's resort to the statute unconstitutionally discriminatory is unsound. The statute authorizes the officer to command as many persons as he may think proper to assist him. There certainly could have been no necessity that would have required more than the two summoned by the officer to watch the back door and advise the policeman at the front if a woman came out. There is nothing in the record to indicate that there was an arbitrary discrimination against appellants in the officer's exercise of his discretion. We will assume, in the absence of evidence to the con-

trary, that an officer acted lawfully and properly in the performance of his duty. *Arkansas Pollution Control Commission* v. *Coyne*, 252 Ark. 792, 481 S.W. 2d 322.

Appellants' arguments, considered both singly and collectively, are not adequate to justify our holding the act unconstitutional, particularly in view of the long period of time during which this act and others in other jurisdictions have been in effect without constitutional attack and the long history of application of the common law in this country.

Appellants also argue that there was not sufficient evidence of a violation of Ark. Stat. Ann. § 41-2801, because (1) they were not the subject of any writ, warrant or process or of any order or rule of court and (2) there was no suggestion that they were held to answer for any legal process. In advancing this argument, they assert that active rather than passive resistance is a necessary element of the crime and that there is no violation of this statute unless force was used to prevent the officer's execution of the warrant in his possession. They continue by asserting that the evidence failed to establish that any resistance or obstruction to the officer's service of the shoplifting warrant was made or threatened by them. Appellants have totally misconstrued these charges or we totally misunderstand them. We understand that the charges of resisting arrest relate to the resistance offered by them to their own warrantless arrest for refusal to obey the officer's command to assist him in the service of the shoplifting warrant, not resistance to the service of the warrant.

Section 41-2801 applies to knowing and wilful obstruction or resistance of an officer in the discharge of any official duty, one of which is a proper arrest without a warrant. *State* v. *Embrey*, 135 Ark. 262, 204 S.W. 1139. See also, *Stuart* v. *State*, 222 Ark. 102, 257 S.W.2d 372. The policeman had the duty and authority to make an arrest for a misdemeanor committed in his presence. *Meyers* v. *State*, 253 Ark. 38 (1972), 484 S.W. 2d 334. If his testimony is to be believed, appellants violated Ark. Stat. Ann. § 42-204 in his presence. Consequently, resistance to, or obstruction of, the officer in performance of this

duty constituted a violation of Ark. Stat. Ann. § 41-2801. The evidence was sufficient in this case to sustain a conviction. Any means employed by one charged with this offense, whether by threats, intimidations, or any other act wilfully done with intent to deter, hinder or prevent an officer from the performance of his duty constitutes a violation of this statute. *Reed* v. *State,* 103 Ark. 391, 147 S.W. 76; Ann. Cas. 1914B 811; *Appling* v. *State,* 95 Ark. 185, 128 S.W. 866, 28 L.R.A.(n.s.) 548. The officer's testimony told of such actions on the part of appellants.

The judgment is affirmed.