James Kelly HAYNES *v.* STATE of Arkansas

CR 02-1087 127 S.W.3d 456

Supreme Court of Arkansas
Opinion delivered October 30, 2003

[Petition for rehearing denied December 11, 2003.*]

---

* BROWN and HANNAH, JJ., would grant.

*Henry & Cullen, LLP*, by: *Tim Cullen*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.

Tom Glaze, Justice. Appellant James K. Haynes was convicted of raping and burglarizing a ninety-four-year-old woman in Fort Smith; he was sentenced to life imprisonment on the rape conviction, and forty years on the burglary. On appeal, he argues that there was insufficient evidence to support his convictions, and that the trial court erred in denying his motion to suppress DNA evidence.

For his first point on appeal, Haynes argues that there was no direct evidence that he committed the crimes for which he was convicted. He insists that the evidence arrayed against him was purely circumstantial, and that this circumstantial evidence does not force the mind to rise beyond speculation or conjecture. This court has held numerous times that circumstantial evidence may constitute substantial evidence. *Gregory v. State*, 341 Ark. 243, 15 S.W.3d 690 (2000); *Dixon v. State*, 311 Ark. 613, 846 S.W.2d 170

(1993). Guilt can be established without eyewitness testimony, and evidence of guilt is not less because it is circumstantial. *Gamble v. State*, 351 Ark. 541, 95 S.W.3d 755 (2003); *Gregory, supra; Trimble v. State*, 316 Ark. 161, 871 S.W.2d 562 (1994). Whether the evidence is direct or circumstantial, however, it must still meet the requirement of substantiality; that is, it must force the fact-finder to reach a conclusion one way or the other without resorting to speculation or conjecture. *Edmond v. State*, 351 Ark. 495, 95 S.W.3d 789 (2003); *Gregory, supra; Chism v. State*, 312 Ark. 559, 853 S.W.2d 255 (1993).

■■ The longstanding rule in the use of circumstantial evidence is that the evidence must exclude every other reasonable hypothesis than that of the guilt of the accused in order to be substantial. *Smith v. State*, 337 Ark. 239, 988 S.W.2d 492 (1999); *Smith v. State*, 282 Ark. 535, 669 S.W.2d 201 (1984); *Upton v. State*, 257 Ark. 424, 516 S.W.2d 904 (1974). In *Gregory v. State, supra*, this court quoted from *Bowie v. State*, 185 Ark. 834, 49 S.W.2d 1049 (1932), as follows:

> This demands that in a case depending upon circumstantial evidence the circumstances relied upon must be so connected and cogent as to show guilt to a moral certainty, and must exclude every other reasonable hypothesis than that of the guilt of the accused. Circumstances, however strong they may be, ought never to coerce the mind of the jury to a conclusion of guilt if they can be reconciled with the theory that one other than the defendant has committed the crime, or that no crime has been committed at all.

*Gregory*, 341 Ark. at 248; *see also Carter v. State*, 324 Ark. 395, 921 S.W.2d 924 (1996); *Studdard v. State*, 243 Ark. 73, 419 S.W.2d 134 (1967). Once a trial court determines the evidence is sufficient to go to the jury, the question of whether the circumstantial evidence excludes every hypothesis consistent with innocence is for the jury to decide. *Smith v. State*, 337 Ark. 239, 988 S.W.2d 492 (1999). Upon review, this court determines whether the jury resorted to speculation and conjecture in reaching its verdict. *Boone v. State*, 282 Ark. 274, 668 S.W.2d 17 (1984). Two equally reasonable conclusions as to what occurred merely gives rise to a suspicion of guilt. *Carter v. State*, 324 Ark. 395, 921 S.W.2d 924 (1996). We will set aside a judgment based upon evidence that did not meet the required standards, and thus left

the fact finder only to speculation and conjecture. *Smith v. State*, 264 Ark. 874, 575 S.W.2d 677 (1979); *see also Jones v. State*, 246 Ark. 1057, 441 S.W.2d 458 (1969).

We turn now to the merits of Haynes's sufficiency argument. The evidence introduced at trial showed the following events took place on May 3, 2000. At about 2:30 a.m. on that morning, the ninety-four-year-old victim in this case had been sleeping on her sofa when she was awakened by someone's hands around her throat. Her attacker, who was wearing a mask and gloves, threw her to the floor and raped her. The victim could see the intruder's wrists between his gloves and the cuffs of his shirt, allowing her later to tell the police that her attacker was African-American. Demanding money, the man called her by her nick-name, "Momma." As he got up to go through her purse, the victim noticed that her phone was off the hook; she told the intruder "they got you . . . the police are on their way." The attacker then fled through the back door of the victim's house.

When the police arrived, they found a cinder block outside under the victim's kitchen window; a white blanket was also spread out on the ground. In investigating the scene, Sergeant Jamie Hammond also discovered a ski mask and a pair of gloves on the ground next to a dumpster located 129 feet from the rear of the victim's house. Although the ground was wet, due to a recent rain, these items were dry. Sergeant Hammond showed the victim the mask and gloves and asked her to identify them. She averred that they looked familiar, and that they resembled the items worn by her attacker. At trial, upon being shown the mask recovered from the crime scene, the victim testified, "As far as I can remember, that looks like it." The police sent the gloves and mask to the State Crime Lab for DNA testing.

On October 21, 2000, Sergeant Hammond received a phone call from Kermit Channell, the supervisor of the Forensic Biology Section of the State Crime Lab. Channell informed Hammond that he had gotten a "hit" on the DNA that was obtained from the ski mask recovered at the crime scene. Channell advised Sergeant Hammond that the DNA corresponded to a sample that had previously been taken from Haynes. As a result of his conversation with Channell, Sergeant Hammond contacted Haynes on October 21. Hammond told Haynes that the police were investigating a break-in at a residence on North 33rd Street; Haynes denied knowing where the house was or that he had been

involved in the crime. Sergeant Hammond then informed Haynes that his DNA had been found on evidence taken from the crime scene. Haynes denied owning the mask and gloves, and said that he had never had a mask like that on his head. However, Haynes later said that he worked at a chicken plant and had worn gloves like those recovered by the police. Haynes also knew exactly where the dumpster was, and stated that he had worked on the house across the corner from the victim's house; nonetheless, he still denied knowing where her house was. Sergeant Hammond interviewed Haynes again the next day, and this time, Hammond told Haynes that his DNA was found on the mask. Haynes offered no response or explanation as to how it might have gotten there.

At trial, Channel testified that, based on a comparison of saliva found on the ski mask at the crime scene and Haynes's blood sample, the DNA from the saliva matched the DNA from the blood sample. On cross-examination, Channell stated that the chances of the DNA found on the ski mask belonging to someone other than Haynes were less than one in a trillion.

On appeal, Haynes asserts that the evidence does not place him at the crime scene, and he argues that the "circumstances of the saliva sample near the eye hole of a discarded ski mask near a dumpster that happens to be in the neighborhood of the attack is tenuous evidence at best." Haynes claims there are numerous reasonable alternate explanations for the presence of the DNA, and asserts that the presence of the DNA alone does not link him to this crime. Additionally, Haynes contends, the State's own DNA expert testified that there was no way to date the stain found on the mask, and that it could possibly last on the mask for years.

In arguing that his conviction was based on purely circumstantial evidence that could not have been substantial enough to force or compel reasonable minds to reach a conclusion one way or the other, Haynes relies primarily on the case of *Standridge v. State*, 310 Ark. 408, 837 S.W.2d 447 (1992). In *Standridge*, this court reversed appellant Standridge's conviction for manufacturing marijuana, where the only evidence linking Standridge to the growing marijuana crop was his fingerprint on a plastic cup, found next to a tent in which some of the plants were growing. The State's fingerprint expert testified that he had no way of knowing where Standridge might have touched the cup; he also stated that the print could have been made as much as a year earlier, and could have been "anywhere in the world" when it was touched by

Standridge. In reversing, this court held that there was no evidence to suggest when or where Standridge touched the cup, whether he had ever purchased it, or how it came to rest near the marijuana. The court further wrote that "[t]he evidence was insufficient to compel reasonable minds to conclude that [Standridge] was at the crime scene, and even less sufficient to compel the conclusion that he was engaged in the 'manufacture' of marijuana." *Standridge*, 310 Ark. at 410.

Haynes also cites *Ravellette v. State*, 264 Ark. 344, 571 S.W.2d 433 (1978), in which this court also reversed a drug conviction due to insufficient evidence. In *Ravellette*, the evidence showed only that there were drugs in Ravellette's house, which he shared with another man, although there were no drugs found in his room. Ravellette's roommate and co-defendant testified that another friend had left the marijuana in the house the night before Ravellette's arrest, and the roommate completely exonerated Ravellette of any knowledge of the presence of control of the contraband. *Ravellette v. State*, 264 Ark. at 346.

 Here, unlike the situation in *Standridge*, the State presented proof that Haynes's undegraded DNA was on a ski mask, found with a pair of gloves 129 feet from the back door of the house where the rape occurred; the victim testified that her attacker wore a ski mask and gloves, and that the mask and gloves shown to her by police looked like the ones she saw on her attacker. The State's DNA expert, Kermit Channell, testified that the DNA could not have been on the mask, exposed to the elements, for very long, or it would have degraded. Further, the mask and gloves were dry, despite the fact that it had been raining earlier on the morning of May 3 and the ground was wet. Haynes's argument that Channell testified that the stain could last on the mask for years is without merit. Channell's testimony was actually that, although he could not definitively say how long the saliva stain had been on the mask, he could determine that there was no degradation in the DNA, which meant that it had not been exposed to the elements for very long. Channell further opined that, had the mask been outside for any length of time, or had it been exposed to rain, there would have been some degradation to the DNA. Therefore, given the intactness of Haynes's DNA on the mask, the victim's recognition of the mask and gloves as looking like the ones her attacker wore, and the proximity of the mask and gloves to the victim's house, the jury could have reasonably

concluded that Haynes had worn the mask and gloves inside the victim's house when he raped her, and had thrown them next to the nearby dumpster as he fled from her house.

This case is distinguishable from *Standridge* in yet another way. In *Standridge*, as noted above, this court held that the evidence was insufficient to compel reasonable minds that Standridge was at the crime scene, and even less sufficient to compel the conclusion that he was engaged in the manufacture of marijuana. Here, by way of contrast, there was abundant evidence that placed Haynes near the scene of the crime, including Haynes's own statement to Sergeant Hammond. Haynes admitted that he had been to the apartments down the street from the victim's house in the first part of May, and he also stated that he had been to houses that were within a block or two of the victim's house. As discussed above, Haynes even said that he had worked on a house that was directly across the corner from the victim's house, but nevertheless denied that he was aware of the victim's house. A defendant's improbable explanations of suspicious circumstances may be admissible as proof of guilt. *See Ware v. State*, 348 Ark. 181, 75 S.W.3d 165 (2002).

We further note that, at oral argument, counsel for Haynes relied on this court's frequently stated rule that, for circumstantial evidence to constitute substantial evidence of guilt, the evidence must be inconsistent with any other reasonable hypothesis. In an attempt to pose another "reasonable" explanation for how Haynes's DNA might have come to be on the ski mask, counsel suggested that Haynes might have recently and fortuitously walked past the mask and spat on it. However, we conclude that such a hypothesis is pure whimsy. For Haynes's DNA to have been in an undegraded condition, as Channell testified that it was, Haynes would have had to come across the ski mask and spit on it within a very short amount of time following the mask having been discarded. However, Haynes's alibi witnesses testified that he was at his wife's home, enjoying a cookout with family and friends on the evening prior to the victim's rape. Haynes's alternate theory also conflicts with his wife's testimony that he was home during this evening and early morning period when the victim was violated. Simply put, Haynes's alternative hypothesis is also inconsistent with his alibi defense, and is there-

fore unreasonable. In sum, we conclude that there was sufficient evidence to convict Haynes of rape.[1]

 Haynes's second point on appeal is that the trial court erred when it denied his motion to suppress DNA evidence allegedly obtained in violation of his Fourth Amendment rights. The law is settled that the taking of blood by a law enforcement officer amounts to a Fourth Amendment search and seizure. *Schmerber v. California*, 384 U.S. 757 (1966); *Russey v. State*, 336 Ark. 401, 985 S.W.2d 316 (1999); *Mills v. State*, 322 Ark. 647, 910 S.W.2d 682 (1995). Since the *Schmerber* and *Mills* decisions, our General Assembly has enacted Act 737 of 1997, which authorizes the taking of blood samples in limited instances. To answer Haynes's suppression issue requires us to examine Act 737, now known as the "State Convicted Offenders DNA Database Act."

Act 737 is codified at Ark. Code Ann. § 12-12-1101 *et seq.* (Repl. 1999 & Supp. 2003), and its purpose is to establish a DNA data bank containing DNA samples submitted by individuals convicted of sex and violent offenses. Act 737 was passed in order to assist law enforcement agencies in the identification and detection of individuals in criminal investigations. Ark. Code Ann. § 12-12-1102 (Repl. 1999). The original Act provided that a person who was adjudicated guilty "for a sex offense, a violent offense, or a repeat offense on or after August 1, 1997, shall have a deoxyribonucleic acid (DNA) sample drawn," either upon incarceration following conviction, or, if the person is already confined at the time of sentencing, immediately after the sentencing. *See* Ark. Code Ann. § 12-12-1109(a) (Repl. 1999). In 2001, Act 737 was amended by Act 218 to add "residential or commercial burglary" as target offenses.[2] Act 218 provided that a DNA sample shall be drawn from a "person who is adjudicated guilty for a . . .

---

[1] With respect to the burglary conviction, which Haynes also challenges, a person commits residential burglary if he enters or remains unlawfully in a residential occupiable structure of another person with the purpose of committing therein any offense punishable by imprisonment. Ark. Code Ann. § 5-39-201(a)(1). By breaking into the victim's house to rape her, Haynes committed the offense of burglary.

[2] *See* Ark. Code Ann. § 5-39-201(a) & (b) (Repl. 1997). In 2003, the Act was broadened even further to include as a qualifying offense "any felony offense as defined in the Arkansas Criminal Code or a sexual offense classified as a misdemeanor as defined by the . . . Code or a repeat offense as defined in this section." *See* Act 1470 of 2003, § 2(9); Ark. Code Ann. § 12-12-1103(9) (Supp. 2003).

*residential or commercial burglary on or after August 1, 1997.*" § 12-12-1109(a) (Supp. 2001) (emphasis added). On August 23, 2000, Haynes was convicted of residential burglary, and the trial court denied his motion to suppress because the State would eventually have come lawfully into possession of his DNA sample before Haynes was tried on the rape and burglary charges against him in the present case.

In this appeal, Haynes re-asserts his contention that the trial court should have granted his motion to suppress because the blood sample had been illegally taken from him when he was incarcerated in 1997 for non-payment of child support, which was not a qualifying offense named in Act 737. It was on the basis of this mistaken, illegal blood sample that, in October of 2000, the State Crime Lab's search of its DNA database generated a positive "hit," identifying Haynes as a potential donor of saliva found on the ski mask recovered from near the crime scene. The State used this information from the Crime Lab to show probable cause and to file a motion on January 8, 2002, to obtain a sample of blood and other bodily fluids from Haynes. The trial court entered an order on that same day, directing Haynes to provide a blood sample. On March 21, 2002, Haynes filed a motion to suppress evidence obtained by the police in connection with the removal of blood from him pursuant to the court's order. In his motion, Haynes argued that the State illegally took his blood in 1997, and as of October of 2000, he had not committed a crime for which the law required the placing of his DNA into the database.

Haynes further argues on appeal that his 1997 blood sample was not given voluntarily, but was given under duress because Act 737 requires prisoners who refuse to give such a sample to be automatically denied parole. In support of this contention, he points to Kermit Channell's testimony at the suppression hearing, wherein Channell stated that inmates who would not submit a sample would not be released by the Department of Corrections until such time that a sample was submitted. Channell also testified that the only way Haynes's DNA should have been in the database in October of 2000 was by mistake, because, at the time Haynes's DNA sample was obtained in 1997, nonsupport was not an offense for which a blood sample should have been taken. Therefore, Haynes argues, because he was not incarcerated for a qualifying offense in 1997, his blood sample — which provided the initial "hit" that caused Channell to contact the Fort Smith Police in October of 2000 — was illegally obtained, and evidence stemming

from that sample should have been suppressed. Citing *Wong Sun v. United States*, 371 U.S. 471 (1963), Haynes further argues that the second DNA sample, taken in January of 2002, should likewise have been suppressed, because the decision to obtain that sample was a direct result of the illegal 1997 sample.

██ ██ We affirm the trial court's denial of Haynes's suppression motion, because the State inevitably would have discovered Haynes's DNA profile. The "inevitable discovery rule" provides that evidence otherwise subject to suppression can be admissible if the State proves by a preponderance of the evidence that the police would have inevitably discovered the evidence by lawful means. *Colbert v. State*, 340 Ark. 657, 13 S.W.3d 162 (2000); *Thompson v. State*, 333 Ark. 92, 966 S.W2d 901 (1998); *Brunson v. State*, 296 Ark. 220, 753 S.W2d 859 (1988). As mentioned above, Haynes was convicted of residential burglary on August 23, 2000; he was not to be released on parole until December of 2001. In August of 2001, however, Act 737 was amended to include residential burglary as an offense for which blood samples should be taken. Section 1(a)(4) of Act 218 of 2001, in effect at the time Haynes would have been released, provided that, "[u]nder no circumstance shall a person who is adjudicated guilty . . . for . . . residential or commercial burglary . . . be released in any manner after such disposition unless and until a . . . DNA sample has been drawn." Act 218 was effective as to persons adjudicated guilty of residential burglary on or after August 1, 1997. Act 218, § 1(a). Haynes was not to be released from prison until December of 2001 under his residential burglary conviction; therefore, the DNA match eventually would have been lawfully discovered.

Haynes argues that the State offered no proof that such a DNA sample was actually taken, and that the State has failed to meet its burden of proof. However, at the suppression hearing, Channell testified that, even in 1997, blood samples had been taken from *all* the prisoners as required by Act 737. Admittedly, Haynes's sample had been taken mistakenly because he was not incarcerated for a qualifying offense as defined by the Act in 1997, but he did commit such a qualifying offense — residential burglary — in August of 2000, and was incarcerated for that offense at the time Act 737 was amended to encompass residential burglary.

■ ■ A presumption exists that public officials will follow the law in performance of their duties. *See, e.g., Dilday v. State*, 300 Ark. 249, 778 S.W.2d 618 (1989); *Williams v. State*, 253 Ark. 973, 490 S.W.2d 117 (1973); *Arkansas Pollution Control Comm'n v. Coyne*, 252 Ark. 792, 481 S.W.2d 322 (1972). Here, the State met its burden to show Haynes's DNA evidence would inevitably have been discovered. The State was required, by statute, to obtain a DNA sample from Haynes before he was released from prison following his conviction and sentence for residential burglary, and there was testimony by Kermit Channell that, even in 1997, blood samples had been taken from *all* prisoners. The evidence of Haynes's DNA match would have been discovered upon Haynes's release from prison following his residential burglary conviction; therefore, the Crime Lab would have obtained its "hit" on Haynes's DNA at that time, which was well before Haynes was brought to trial on the rape charge on May 9, 2003. Once again, the State eventually would have come legally into possession of his DNA sample, and Haynes, who has not rebutted the presumption discussed above, has not demonstrated how he was prejudiced by the trial court's denial of his suppression motion. As a result, the trial court did not err in denying Haynes's motion to suppress.

Pursuant to Ark. Sup. Ct. R. 4-3(h), the record in this case has been reviewed for other potentially prejudicial errors, and none are found. We affirm.

BROWN and HANNAH, JJ., dissent.

ROBERT L. BROWN, Justice, dissenting. By everyone's agreement, the blood sample taken from the appellant, James Kelly Haynes, for DNA testing was illegally seized. This is so because it was taken in connection with failure to pay child support, which was not a qualifying or targeted offense for drawing blood samples for DNA testing under Act 737 of 1997. *See* Ark. Code Ann. § 12-12-1103(a) (Supp. 1997). It is that illegally drawn blood sample that caused the "hit" in connection with the DNA taken from the ski mask on October 21, 2000. Haynes correctly argues that the second blood sample drawn from him in January 2002 should also be suppressed as fruit of the poisonous tree under *Wong Sun v. United States*, 371 U.S. 471 (1963).

Whether to suppress the 1997 and 2002 searches really turns on the question of whether Haynes's DNA would have been inevitably discovered as a result of his release from prison on his residential burglary conviction in December 2001. *See* Ark. Code Ann. § 12-12-109(a) (Supp. 2001). State law required that taking a blood sample was a condition for release on a residential burglary at that time. *Id.* The United States Supreme Court has adopted inevitable discovery as an exception to the exclusionary rule for illegal police conduct. *See Nix. v. Williams,* 467 U.S. 431 (1984). The State has the burden of proving that the information would have been inevitably discovered by police officials. *Id.*

The majority writes that the State met its burden of proving that police officials inevitably would have discovered Haynes's DNA because police officials are presumed to follow the law. In other words, the majority presumes prison officials took the blood sample because they were supposed to do so. However, there is no proof that they actually did do so.

The caselaw cited by the majority does not stand for the proposition that police officers performed a certain act. Rather, the caselaw cited deals with situations involving whether public officials acted *properly* or *in good faith. See Dilday v. State,* 300 Ark. 249, 778 S.W.2d 618 (1989) (presume sheriff's deputies properly performed duties though paid with private funds); *Williams v. State,* 253 Ark. 973, 490 S.W.2d 117 (1973) (presume police officer did not arbitrarily discriminate against two individuals whom he arrested for a misdemeanor after they refused to help him); *Arkansas Pollution Control Comm'n v. Coyne,* 252 Ark. 792, 481 S.W.2d 322 (1972) (presume Pollution Control Commission acted lawfully and in good faith in denying permit for septic tanks).

In the instant case, the issue is whether law enforcement performed the act of drawing blood in 2001 at all, not whether they performed it properly. The burden was on the State to prove this; yet all the State has done is call on this court to speculate about whether the blood was drawn or not. Absent some proof to confirm that prison officials drew blood when Haynes was released in 2001, I would not *presume* this was done. Under the majority's reasoning, we would presume law enforcement always performed acts they were supposed to perform, such as giving accused individuals their *Miranda* warnings, because the law requires them to do so. Surely, no court has gone that far, and I am not willing to do so in the instant case.

Because there is no proof that prison officials lawfully took a blood sample from Haynes, I would suppress the search. For that reason, I respectfully dissent.

HANNAH, J., joins.

JIM HANNAH, Justice, dissenting. I respectfully dissent because I believe that the State failed to meet its burden of proof that the DNA match would eventually have been lawfully discovered. The "inevitable discovery rule" provides that evidence otherwise subject to suppression can be admissible if the State. proves by a preponderance of the evidence that the police would have inevitably discovered the evidence by lawful means. *Colbert v. State*, 340 Ark. 657, 13 S.W.3d 162 (2000). The application of the rule to the present ·case means that, if the State showed, by a preponderance of the evidence, that the DNA match would eventually have been lawfully discovered, then the trial court properly admitted the results of the illegally-obtained 1997 DNA match.

At the suppression hearing, the State introduced proof that Haynes had been convicted of residential burglary on August 23, 2000, and that he was sentenced to forty-eight months in prison. The only other evidence the State offered at the suppression hearing to support its argument that the DNA match would eventually have been lawfully discovered is the following state-ment by the deputy prosecutor:

> . . . [W]e have inevitable discovery which I would ask the Court to take judicial notice of the Court's record noting that Mr. Haynes was convicted on August 23rd of the year 2000 of Residential Burglary, which is a targeted offense, and a D.N.A. sample would have been drawn based upon that.

The majority opines that the State need not offer any further proof since a presumption exists that public officials will follow the law in performance of their duties. Further, the majority states: "There is no evidence to show that the State failed to enforce Act 737, as amended. It was only shown that the State took Haynes's sample for a non–target offense in 1997."

The majority has improperly shifted the burden from the State to Haynes. It is the State's burden, not Haynes's burden, to prove by a preponderance of the evidence that the illegally-obtained DNA match would eventually have been legally discov-

ered. The State did not meet its burden by requesting that the trial court take judicial notice that an Act was passed by the General Assembly.

The State did not present evidence that a DNA sample had been drawn from Haynes prior to his release from the Arkansas Department of Corrections in December 2001. Instead, the State presented testimony from Kermit Channell explaining the State's DNA testing procedures in 1997. The majority states that "there was testimony by Kermit Channell that, *even in 1997*, blood samples had been taken from all prisoners." (Emphasis added.) Channell did not testify about the State's DNA testing procedures in years subsequent to 1997. The majority fails to explain how Channell's testimony concerning the State's DNA testing procedures in 1997 offers proof that the State complied with Act 737, as amended, in 2001.

In sum, the State failed to meet its burden of proving that the 1997 DNA sample was admissible in light of the "inevitable discovery rule." As such, I believe the trial court erred in denying Haynes's motion to suppress. I would reverse and remand.

BROWN, J., joins this dissent.