STATE OF CONNECTICUT *v.* FREDERICK NUGENT
(12475)

HEALEY, SHEA, DANNEHY, SANTANIELLO and CALLAHAN, Js.

Argued February 4—decision released May 6, 1986

*John R. Williams,* with whom, on the brief, was *Beth Merkin,* law student intern, for the appellant (defendant).

*Julia DiCocco Dewey,* assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, and *Michael Dearington,* assistant state's attorney, for the appellee (state).

CALLAHAN, J. The defendant was charged in a substitute information with kidnapping in the second degree, burglary in the third degree, and assault in the third degree. After a jury trial, he was convicted of kidnapping in the second degree in violation of General Statutes § 53a-94[1] and acquitted of the other two charges. The trial court sentenced the defendant to a term of imprisonment of four years, suspended the execution of the sentence and placed him on probation. The defendant was also assessed a fine in the amount of $2000.

---

[1] "[General Statutes] Sec. 53a-94. "KIDNAPPING IN THE SECOND DEGREE: CLASS B FELONY. (a) A person is guilty of kidnapping in the second degree when he abducts another person.

"(b) Kidnapping in the second degree is a class B felony."

The defendant claims on appeal that the trial court erred: (1) by failing to charge the jury on the defense of mistake of law under General Statutes § 53a-6;[2] (2) by charging the jury that as a matter of law the restraint of the victim by the defendant was unlawful; and (3) by denying the defendant's motion for a judgment of acquittal at the close of the state's case. The defendant also claims that he was denied the effective assistance of counsel. We conclude that the trial court erred by charging the jury that the restraint of the victim by the defendant was unlawful as a matter of law. Since the disposition of this claim is dispositive of the case, we do not consider the defendant's other claims of error.

The defendant was a professional bail bondsman who wrote bail bonds as an agent for the Peerless Insurance Company. On June 3, 1983, he posted a bail bond in the amount of $500 for William Barraso. Prior to June 3, Barraso had been arrested under the name of William Shea and confined in lieu of bond in New Haven on charges of larceny in the sixth degree, and failure

[2] "[General Statutes] Sec. 53a-6. EFFECT OF IGNORANCE OR MISTAKE. (a) A person shall not be relieved of criminal liability for conduct because he engages in such conduct under a mistaken belief of fact, unless: (1) Such factual mistake negates the mental state required for the commission of an offense; or (2) the statute defining the offense or a statute related thereto expressly provides that such factual mistake constitutes a defense or exemption; or (3) such factual mistake is of a kind that supports a defense of justification.

"(b) A person shall not be relieved of criminal liability for conduct because he engages in such conduct under a mistaken belief that it does not, as a matter of law, constitute an offense, unless (1) the law provides that the state of mind established by such mistaken belief constitutes a defense, or unless (2) such mistaken belief is founded upon an official statement of law contained in a statute or other enactment, an administrative order or grant of permission, a judicial decision of a state or federal court, or an interpretation of the statute or law relating to the offense, officially made or issued by a public servant, agency or body legally charged or empowered with the responsibility or privilege of administering, enforcing or interpreting such statute or law."

to appear in the second degree. On June 7, 1983, Barraso appeared in court and his case was continued until June 14, 1983. On June 14, Barraso failed to appear as scheduled in geographical area number six in New Haven. On that date, the court, *Maiocco, J.*, called and forfeited the $500 bond posted by the defendant and ordered that a rearrest warrant be issued for Barraso. The defendant was notified of the bond forfeiture shortly thereafter and a rearrest warrant was issued on either June 28 or June 30, 1983.

On the evening of July 18, 1983, while the rearrest warrant was outstanding the defendant was notified by Robert McLellan that Barraso could be located in a rooming house at 73 Whitney Avenue in New Haven. McLellan resided at the same rooming house and had known Barraso for three or four years. He had induced the defendant to post Barraso's bond and was apprehensive that he might have some personal liability on the bond if Barraso did not fulfill his obligation to appear in court. After being contacted by McLellan, the defendant went to New Haven police headquarters that same evening and inquired of Sergeant Michael Sweeney, who was in charge of the detention area, whether there were outstanding warrants for Barraso. Sweeney called the records division on the telephone and, because he was busy, handed the phone to the defendant to allow him to ascertain the requested information for himself. The defendant testified that at that time he was told there were two outstanding arrest warrants for Barraso.

At about 10 p.m. the defendant met McLellan and they went to 73 Whitney Avenue. McLellan, who had a key, admitted them to the building and they proceeded to a room rented by James Shea. Shea was a friend of Barraso and Barraso frequently slept in his room. While McLellan was knocking on the door to gain admittance, James Shea arrived in the hallway out-

side his room, opened the door, and McLellan and the defendant entered. The defendant confronted Barraso, who had been sleeping, and requested him to dress and accompany him and McLellan to New Haven police headquarters to turn himself in. Barraso protested and told the defendant he would "straighten it out tomorrow." The defendant persisted and Barraso reluctantly dressed and accompanied the defendant and McLellan. Once outside the building he bolted, but after a short chase he was caught by the defendant, placed in the back seat of the defendant's automobile and driven to New Haven police headquarters.

When the trio arrived at headquarters at about 10:30 p.m., Sweeney was still on duty in the detention area. The defendant told Sweeney that Barraso had come to turn himself in voluntarily. After observing the situation and talking with Barraso, Sweeney concluded that Barraso had not appeared at headquarters voluntarily and inquired of the defendant whether he had a "bail piece."[3] See General Statutes § 54-65. The defendant said that he did not but that there were outstanding arrest warrants. Sweeney then checked with the records division and was told that the only active warrant for Barraso was a West Haven arrest warrant and that there were no New Haven warrants. The record is unclear as to the reason, but apparently the rearrest warrant issued at the end of June by the Superior Court in geographical area number six was not yet at New Haven police headquarters. At that point, Sweeney had Barraso arrested on the West Haven warrant and he arrested the defendant and McLellan for the unlawful restraint of Barraso.

At trial, in response to questions by the prosecutor, the defendant opined that he had no right because of

---

[3] By "bail piece" Sergeant Sweeney was apparently referring to a mittimus issued under General Statutes § 54-65.

his status as a professional bondsman to take Barraso into custody or restrain him despite the fact that Barraso had failed to appear in court on June 14, his bond had been forfeited, and a rearrest warrant issued. Nugent's defense rather was that Barraso had accompanied him and McLellan to police headquarters voluntarily and both he and McLellan testified to that effect. There was sufficient evidence, however, for the jury to find that Barraso had been restrained and forced to accompany the defendant and McLellan.

At the conclusion of the evidence, the trial court charged the jury that the defendant had no special arrest powers and no authority exceeding that of a private citizen to apprehend and detain Barraso. It also instructed the jury that the rearrest warrant was directed to a "proper officer," and that the defendant was not a "proper officer" and had no authority by virtue of the warrant to arrest Barraso. The trial court then referred to the factual situation and charged the jury that, as a matter of law, the defendant had no authority to arrest Barraso. It defined "arrest" as meaning "to deprive another of his liberty. That is, to take custody of him."

The defendant contends that the trial court's instructions in this regard were erroneous and that the erroneous instructions created a conclusive presumption that the restraint of the victim was unlawful. Unlawful restraint of the victim is an essential element of the crime of kidnapping. See General Statutes § 53a-91 (1) and (2).[4] The defendant argues, therefore,

---

[4] "[General Statutes] Sec. 53a-91. DEFINITIONS. The following definitions are applicable to this part:

"(1) 'Restrain' means to restrict a person's movements intentionally and unlawfully in such a manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent. As used herein 'without consent' means, but

that he was deprived of due process of law because the instruction permitted the jury to convict him without finding a necessary element of the crime proved beyond a reasonable doubt. *Sandstrom* v. *Montana,* 442 U.S. 510, 517, 522, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979); *In re Winship,* 397 U.S. 358, 363–64, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *Morrisette* v. *United States,* 342 U.S. 246, 275–76, 72 S. Ct. 240, 96 L. Ed. 288 (1952). This claim was not raised at trial. Since the record adequately supports a claim that the defendant was deprived of a fundamental constitutional right and a fair trial, however, we will review it. *State* v. *Kurvin,* 186 Conn. 555, 558, 442 A.2d 1327 (1982); *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973).

The common law confers on the surety[5] on a bail bond the right to apprehend and deliver his principal in discharge of his bail at any time. *Taylor* v. *Taintor,* 83 U.S. 366, 371, 21 L. Ed. 287 (1873); *Read* v. *Case,* 4 Conn. 166, 170 (1822). This right has been upheld when a bondsman forcibly entered his principal's home in the middle of the night; *Read* v. *Case,* supra, 170; when a bondsman pursued his principal beyond state lines; *Fitzpatrick* v. *Williams,* 46 F.2d 40, 41 (5th Cir. 1931); and when the bondsman used physical force in the act of apprehending his principal. *Nicolls* v. *Ingersoll,* 7 Johns. 145 (N.Y. Sup. Ct. 1810); see note, "The Hunters and

is not limited to, (a) deception and (b) any means whatever, including acquiescence of the victim, if he is a child less than sixteen years old or an incompetent person and the parent, guardian or other person or institution having lawful control or custody of him has not acquiesced in the movement or confinement.

"(2) 'Abduct' means to restrain a person with intent to prevent his liberation by either (a) secreting or holding him in a place where he is not likely to be found, or (b) using or threatening to use physical force or intimidation. . . ."

[5] The party who posts the required amount of bail is commonly called the "bail bondsman" or "surety," and in older cases is referred to simply as the "bail." The "principal" is the person who has been arrested and is released on bond pending his scheduled court appearance.

The Hunted: Rights and Liabilities of Bailbondsmen,"
6 Fordham Urb. L.J. 333 (1978).

Bail is considered a continuation of the original
imprisonment. In *Taylor* v. *Taintor,* a case which arose
out of a Connecticut bail bond, the United States
Supreme Court said: "When bail is given, the prin-
cipal is regarded as delivered to the custody of his sur-
eties. Their dominion is a continuance of the original
imprisonment. Whenever they may chose to do so, they
may seize him and deliver him up in their discharge; and
if that can not be done at once, they may imprison him
until it can be done. They may exercise their rights in
person or by agent. They may pursue him into another
state; may arrest him on the Sabbath; and if necessary,
may break and enter his house for that purpose. The
seizure is not made by virtue of new process. None is
needed. It is likened to the rearrest by the sheriff of
an escaping prisoner. [Citations omitted.] In [*Anony-
mous,* 6 Mod. 231 (1703),] it is said, 'The bail have their
principal on a string, and may pull the string whenever
they please and render him in their discharge.' " *Tay-
lor* v. *Taintor,* supra, 371; *Carlson* v. *Landon,* 342 U.S.
524, 547, 72 S. Ct. 525, 96 L. Ed. 547 (1952); *Reese* v.
*United States,* 76 U.S. 13, 21, 19 L. Ed. 541 (1869);
*United States* v. *Lee,* 170 F. 613, 614 (S.D. Ohio 1909).
"The right of the bail over his principal, whether exer-
cised personally or by delegation, is too well established
to require any observation. I will barely remark, that
the law supposes the principal to be always in the cus-
tody of his bail; and if he is not in fact, the bail may
take him, when and where he pleases." *Reed* v. *Case,*
supra, 170. "The custody of bail is a continuation of
the original imprisonment." *State* v. *Bates,* 140 Conn.
326, 330, 99 A.2d 133 (1953); *In re Lexington Surety
& Indemnity Co.,* 272 N.Y. 210, 213–14, 5 N.E.2d 204
(1936).

The obligation of the bail bondsman is to ensure his principal's appearance in court; *State* v. *Ohayon,* 12 Ohio App. 3d 162, 163, 467 N.E.2d 908 (1983); and he may use whatever reasonable means are necessary to fulfill that obligation. Absent a statute, he requires no legal process, judicial or administrative, to effect that purpose. The right of the surety to apprehend his principal arises from the furnishing of the bail bond. "The right of the surety to recapture his principal is not a matter of criminal procedure, but arises from the private undertaking implied in the furnishing of the bond. [Citation omitted.] It is not a right of the state but of the surety." *Fitzpatrick* v. *Williams,* supra, 40. Further, "[t]he giving of security is not the full measure of the bail's obligation; it is hornbook law that the accused is delivered into the custody of the bail and the bail is bound to redeliver him so far as he can. It does not discharge the bail from that duty merely to abandon the security. The bail must assist in arresting the convict so far as possible; security is no substitute." *United States* v. *Field,* 190 F.2d 554, 555 (2d Cir. 1951). "The condition of the bond is the appearance of the principal in court on demand. The bail may arrest the principal at any time." *Field* v. *United States,* 193 F.2d 86, 90 (2d Cir. 1951). "Professional Bondsmen in the United States enjoy extraordinary powers to capture and use force to compel preemptory return of a bail jumper. They may do so not only in the state where the bail was granted, but in other states as well, without resort to public authorities, either to the police to effect arrest or the appropriate state officials to bring about extradition." *Kear* v. *Hilton,* 699 F.2d 181, 182 (4th Cir. 1983).

In Connecticut the common law right of a bail bondsman to apprehend his principal may have been modi-

fied by General Statutes § 54-65[6] and its predecessors. Rice, "Bail and the Administration of Bail in the State of Connecticut," 4 Conn. L. Rev. 1, 25 (1971). That thesis is debatable, however, since, at the time the original statute was enacted in 1821,[7] the right of a bail bondsman to retake his principal appears to have been firmly entrenched and the statute does not appear to have *required* the surety to obtain a mittimus but seems rather to have given him an option to apply to the court to seek the aid of the authorities in arresting his principal. See General Statutes (1808 Rev.) title XVI, c. I § 3;[8] *Read* v. *Case,* supra, 168. Correspondingly,

---

[6] "[General Statutes] Sec. 54-65. RIGHTS OF SURETY. Any surety in a recognizance in criminal proceedings, who believes that his principal intends to abscond, may apply to a judge of the superior court, produce his bail bond or evidence of his being a surety, and verify the reason of his application by oath or otherwise. Thereupon, the judge shall immediately grant a mittimus, directed to a proper officer or indifferent person, commanding him immediately to arrest the principal and commit him to a community correctional center. The community correctional center administrator shall receive the principal and retain him in a community correctional center until discharged by due order of law. The surrender of the principal shall be a full discharge of the surety upon his bond or recognizance."

[7] "[General Statutes (1821 Rev.)]

"Title 5, Bail. § 8

"SECT. 8. In all cases, where any person or persons, have executed a bail-bond, or entered into a recognizance for the personal appearance of another, and such bail or surety shall afterwards believe that his principal intends to abscond, such bail, or surety, on application to any justice of the peace, in the county in which such principal resides, and producing his bail-bond, or evidence of his being bail or surety, and verifying the reason of his application, by oath or otherwise, it shall be the duty of such justice forthwith to grant a mittimus, directed to the sheriff, his deputy, or constable, or indifferent person of the county in which such application shall be made, commanding such officer or indifferent person, forthwith to arrest such principal, and him commit to the keeper of the common gaol in such county, who is hereby authorised to receive such principal, and him retain in gaol, until discharged by due order of law."

[8] "[General Statutes (1808 Rev.)]

"Title XVI, Bail. Chapter I, § 3

"§ 3. That in either of the cases aforesaid, every such surety or sureties shall be obliged to satisfy the judgment in case of the principal's avoidance, and a return of *non est inventus* on the execution; unless such surety, at

the present statute is couched in precatory terms and does not appear to *require* a bail bondsman to seek a mittimus. See *Seals* v. *Hickey,* 186 Conn. 337, 346, 441 A.2d 604 (1982). In any event, the statute is prospective and applies only if a surety believes his principal intends to abscond in the future. There is no reason to believe General Statutes § 54-65 has otherwise diminished the power of the surety. Rice, supra, 25. The statute has no application to the facts of this case where after the defendant's principal had in fact failed to appear in court, his bond had been forfeited and a rearrest warrant had been issued.

General Statutes (Rev. to 1983) § 54-65a,[9] however, does apply to the facts of this case. That statute provides that, whenever a bond in the amount of $500 or more is ordered forfeited because the principal failed to appear in court as conditioned in the bond, the court shall, at the time of ordering the bond forfeited, issue a rearrest warrant or a mittimus directing a proper officer to take the principal into custody. The question then becomes, does this statute abrogate the common law

or before the time of entering up final judgment, do bring the principal into court, and move to be discharged; upon which the court shall order the keeper of the gaol to receive him into custody, that his body may be taken on the execution."

   [9] "[General Statutes (Rev. to 1983)] Sec. 54-65a. REARREST FOR FAILURE TO APPEAR; REBATE TO SURETY. (a) Whenever an arrested person is released upon his execution of a bond with surety in an amount of five hundred dollars or more and such bond is ordered forfeited because the principal failed to appear in court as conditioned in such bond, the court shall, at the time of ordering the bond forfeited, issue a rearrest warrant and a mittimus directing a proper officer to take the defendant into custody and shall order a stay of execution upon the forfeiture for six months. Such stay of execution shall not prevent the issuance of a rearrest warrant.

   "(b) Whenever an arrested person, whose bond has been forfeited, is returned to the jurisdiction of the court within one year of the date such bond was ordered forfeited, the surety on such bond shall be entitled to a rebate of that portion of the forfeited amount as may be fixed by the court or as may be established by a schedule adopted by rule of the judges of the court."

and furnish the bail bondsman's exclusive remedy when his principal fails to appear according to the terms of his bail bond?

"It is an established rule of statutory construction that statutes are not readily interpreted as abrogating common-law rights." *State* v. *Assuntino,* 173 Conn. 104, 106, 376 A.2d 1091 (1977). It is also a rule of statutory construction that statutes in derogation of the common law are to be strictly construed. *McKinley* v. *Musshorn,* 185 Conn. 616, 621, 441 A.2d 600 (1981); *Blue Cross & Blue Shield of Connecticut, Inc.* v. *Mike,* 184 Conn. 352, 361, 439 A.2d 1026 (1981); *State* v. *Beauton,* 170 Conn. 234, 241, 365 A.2d 1105 (1976). " 'No statute is to be construed as altering the common law, farther than its words import. It is not to be construed as making any innovation upon the common law which it does not fairly express.' *Shaw* v. *Railroad Co.,* 101 U.S. 557, 565, 25 L. Ed. 892 [1880]." *Dennis* v. *Shaw,* 137 Conn. 450, 452, 78 A.2d 691 (1951).

It is obvious from a reading of General Statutes (Rev. to 1983) § 54-65a that it can coexist with the common law right of a bail bondsman to apprehend and surrender his principal. There is nothing in the wording of the statute which abrogates that right and requires the surety to rely on a rearrest warrant or a mittimus to fulfill his obligation. While the statute may provide the bondsman with assistance from the authorities, it does not prohibit him from employing common law sanctioned self-help to return his principal to custody. Further, there is nothing in the scanty legislative history of General Statutes (Rev. to 1983) § 54-65a that indicates a legislative intention to abrogate the common law rights of bail bondsmen.[10] Therefore, if the

---

[10] "I think it's a good bill and that it will *assist* in perhaps apprehending people who have skipped and not appeared in court pursuant to the conditions of the bond." (Emphasis added.) 20 S. Proc., Pt. 8, 1977 Sess., p. 3017, remarks of Senator Salvatore DePiano on H.B. 6909.

defendant was an authorized agent of the bonding company and Barraso had failed to appear in court according to the terms of his bail bond, the defendant had an existing common law right to seize him and return him to the custody of the court. The trial court was in error when it instructed the jury that, as a matter of law, the defendant had no authority to arrest Barraso.

The fact that the defendant acted as an agent for an insurance bonding company, a corporation, rather than as an individual bail bondsman licensed under chapter 533 of the General Statutes is of no moment. See *Curtis* v. *Peerless Ins. Co.,* 299 F. Sup. 429, 435 (D. Minn. 1969). If authorized, he had the same common law right to seize the principal on the bond. The surety may act through an agent. *Taylor* v. *Taintor,* supra, 371; *Fitzpatrick* v. *Williams,* supra, 40; *Curtis* v. *Peerless Ins. Co.,* supra, 435.

It is also of no significance that the defendant testified in response to questions by the prosecutor that he did not have the right to seize and detain Barraso. The salient factor is not whether the defendant did or did not think the right existed but whether the right in fact did exist. The defendant's ignorance of the right does not diminish it. See *Dreier* v. *Upjohn,* 196 Conn. 242, 248, 492 A.2d 164 (1985); *Farley-Harvey Co.* v. *Madden,* 105 Conn. 679, 684, 136 A. 586 (1927).

The course of action pursued by the defendant is not without its risks and a bondsman might very well be liable in tort if he oversteps the bounds of his authority. *McCaleb* v. *Peerless Ins. Co.,* 250 F. Sup. 512, 515 (D. Neb. 1965); *Bennett* v. *State,* 169 Ga. App. 85, 86, 311 S.E.2d 513 (1983). As anachronistic as it may seem, however, the common law right of a bail bondsman to pursue and apprehend his principal, at least after the principal has failed to appear in court and has forfeited

his bond, is alive and well in Connecticut, unless and until the legislature directly addresses the issue.

It is fundamental that the state has the burden of proving all the necessary elements of the crime charged beyond a reasonable doubt. *In re Winship,* supra, 363–64; *State* v. *Brown,* 173 Conn. 254, 260, 377 A.2d 268 (1977). A necessary element of kidnapping in the second degree is that the restraint of the victim be unlawful. See General Statutes §§ 53a-94 (a) and 53a-91 (1), (2). In view of our holding, the state failed to prove that element at the trial. Further, in its brief on appeal, the state concedes that the defendant was a professional bail bondsman who apprehended his principal after the principal failed to appear in court. We are constrained therefore to conclude that there is no issue of fact to submit to a jury on a retrial.

There is error, the judgment is set aside and the case is remanded with direction to render a judgment that the defendant is not guilty of kidnapping in the second degree.

In this opinion the other judges concurred.