STATE OF CONNECTICUT *v.* GREGORY FLOYD
(13914)
STATE OF CONNECTICUT *v.* KENNETH WRIGHT
(13915)
STATE OF CONNECTICUT *v.* JOHN PARADIS
(13916)

PETERS, C. J., SHEA, CALLAHAN, GLASS, COVELLO, HULL and BORDEN, Js.

Argued October 30, 1990—decision released January 8, 1991

*Carolyn K. Longstreth,* assistant state's attorney, with whom, on the brief, was *Steven M. Sellers,* assistant state's attorney, for the appellant (state).

*Robert N. Chatigny,* with whom was *Stacey L. Savin,* for the appellees (defendant in each case).

PETERS, C. J. These consolidated appeals concern the constitutionality of General Statutes § 53a-167b,[1] which makes it a class A misdemeanor for any person to refuse to assist a peace officer or fireman authorized to command assistance in the execution of his duties. The three defendants, Gregory Floyd, Kenneth Wright and John Paradis, were charged under this statute when they failed to assist a Southington police officer who had sought their aid in subduing and arresting a fellow employee at their place of employment. The trial court granted the defendants' motions to dismiss on the ground that the application of the statute to these defendants constituted an unreasonable seizure under the fourth amendment to the federal constitution and deprived the defendants of the due process of law guaranteed by the fourteenth amendment to the federal constitution.[2] The state moved for and received permission

[1] "[General Statutes] Sec. 53a-167b. FAILURE TO ASSIST A PEACE OFFICER OR FIREMAN: CLASS A MISDEMEANOR. (a) A person is guilty of failure to assist a peace officer or fireman when, commanded by a peace officer or fireman authorized to command assistance, he refuses to assist such officer or fireman in the execution of his duties. (b) Failure to assist a peace officer or fireman is a class A misdemeanor."

[2] The trial court also cited the Connecticut constitution's provisions protecting against unreasonable seizures, article first, § 7, and guaranteeing due process of law, article first, § 8, as grounds for its decision. The trial court did not suggest, however, that the state constitutional provisions differed from the federal constitutional provisions in relation to the issues presented here, and the defendants have not argued, on appeal, that the state constitution affords them greater protection than does the federal constitution. We conclude, accordingly, that no serious claims have been raised under the state constitution, and we confine our discussion to the federal constitutional issues presented. *State* v. *Couture,* 194 Conn. 530,

to appeal the trial court's judgment. in each case. Because we construe the statute to authorize a peace officer or fireman to command assistance only in cases of demonstrated necessity, and only if such assistance is reasonable under all the circumstances, we conclude that the statute is not unconstitutional. Accordingly, we reverse the judgment of the trial court and remand the cases for further proceedings.

Although the trial court purported to invalidate the statute "as applied" within the factual nexus of the charges against these defendants, its judgment rests solely on a one paragraph "statement of essential facts" alleged by the state[3] and on the representations of counsel at oral argument on the motion to dismiss. Relying, without an evidentiary hearing, on the state's conclusory allegation that the original arrestee was "endangering" the police officer, the court determined that the defendants would have been compelled to risk physical injury to comply with the officer's call for assistance. On this record, the court essentially has held that a police officer never can be constitutionally justified in commanding assistance in order to effect the arrest of a misdemeanant, when the assistance that is commanded involves a risk of physical injury to the individual whose aid is commanded. The court's invalidation of the statute "as applied" is therefore tantamount to a facial invalidation of the statute,[4] and we review it accordingly.

572A n.2, 482 A.2d 300 (1984) (*Healey, J.,* dissenting), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985); see also *Hayes* v. *Smith,* 194 Conn. 52, 66 n.12, 480 A.2d 425 (1984).

[3] The state provided this document, pursuant to the defendants' requests under Practice Book § 625 for a statement of the essential facts claimed to constitute the offense charged, to supplement the information filed in each case.

[4] The trial court did observe that General Statutes § 53a-167b might have been constitutionally applied if the officer had only ordered the defendants to telephone for police assistance, because such an order "would not risk physical dan-

The following facts were claimed to constitute the offense charged in this case. The state alleged that, on August 5, 1989, Officer Nicholas Spratto of the Southington police department went to the Pratt & Whitney factory in Southington to issue a traffic infraction to a Pratt & Whitney employee, Michael Jamieson, who had been involved in a traffic accident earlier in the day.[5] When Spratto confronted Jamieson, Jamieson "refused to take the infraction" and became "obnoxious." Spratto then asked defendant Floyd, a uniformed Pratt & Whitney security officer, how the company deals with disorderly employees. The defendant referred Spratto to his supervisor, Kenneth Wright, who responded that the company policy in such a situation was to call the Southington police department. Spratto again attempted to issue the infraction to Jamieson, who continued to behave in an "obnoxious, tumultuous manner," and Spratto then placed Jamieson under arrest for breach of the peace, a misdemeanor in violation of General Statutes § 53a-181 punishable by up to six months imprisonment. When Spratto attempted to take Jamieson into custody, Jamieson resisted arrest by struggling and fighting. Spratto then asked defendant Floyd, defendant Wright, who was also a uniformed security officer, and defendant Paradis, a Pratt & Whitney maintenance supervisor who was standing nearby, to assist him in subduing Jamieson. None of the three defendants came to Spratto's assistance; defendant Paradis indicated that he "could not" help Spratto. Spratto called for assistance from the Southington police department and

ger to the person commanded." The court also noted that a different constitutional balancing would be required if a peace officer commanded assistance in capturing a suspected felon.

[5] Spratto had determined that Jamieson had committed the traffic offense of following too closely, an infraction in violation of General Statutes § 14-240 that is punishable by a maximum fine of $90. General Statutes § 51-164m (b).

effected Jamieson's arrest when a second Southington police officer arrived. The defendants were subsequently charged with the crime of failure to assist a police officer in violation of General Statutes § 53a-167b and were arrested by warrant.

The defendants moved to dismiss the charges, arguing that the statute was overbroad and vague in violation of their rights to due process guaranteed by the fourteenth amendment to the federal constitution and article first, § 8 of the Connecticut constitution. The trial court rejected these claims, which have not been renewed by the defendants as alternative grounds for affirmance.

The trial court nonetheless ruled in favor of the defendants by finding a violation of their rights to personal security under the fourth and the fourteenth amendments to the federal constitution. On the basis of the facts alleged by the state, the trial court determined that Spratto's command to the defendants for their assistance was an unreasonable "seizure" of each man under the fourth amendment. Such a "seizure," according to the court, was an unconstitutional abridgment of each man's right to be secure from unreasonable governmental intrusions upon his physical safety. The court also held that the application of § 53a-167b to these defendants offended the interest in personal security guaranteed by the due process clause of the fourteenth amendment. Applying a due process analysis, the court reasoned that any historical justification for state actions threatening the personal safety of individual citizens by requiring their aid in law enforcement efforts had been eliminated by the establishment of paid organized police forces in the nineteenth century.

The state's appeal urges us to overturn the trial court's judgments of dismissal. With regard to the trial

court's fourth amendment ruling, the state maintains that the amendment (1) does not apply, (2) does not characterize the conduct in this case as a seizure, or (3) does not sanction as unreasonable any seizure that may have occurred in this case. With regard to the court's fourteenth amendment ruling, the state contends that § 53a-167b does not violate substantive due process. Finally, the state contends that dismissal of the prosecution was inappropriate because the defendants could have raised their concerns, at trial, by requesting the court, through an appropriately limited construction, to enable them to mount a factual defense to the charges against them. We agree with the state that the trial court's dismissal of the charges was premature.

I

Before we undertake our particularized review of the constitutionality of § 53a-167b, we note that the constitutional challenge to this statute comes to us in the posture least likely to succeed. This court has frequently noted the imprudence of adjudicating constitutional questions in a "factual vacuum." *Lehrer* v. *Davis*, 214 Conn. 232, 234, 571 A.2d 691 (1990); *Motor Vehicle Manufacturers Assn. of the United States, Inc.* v. *O'Neill*, 203 Conn. 63, 75, 523 A.2d 486 (1987). "A party mounting a constitutional challenge to the validity of a statute must provide an adequate factual record in order to meet its burden of demonstrating the statute's adverse impact on some protected interest of its own, in its own particular case, and not merely under some hypothetical set of facts as yet unproven. . . . We do not give advisory opinions, nor do we sit as roving commissions assigned to pass judgment on the validity of legislative enactments." *Motor Vehicle Manufacturers Assn. of the United States, Inc.* v. *O'Neill*, supra.

A party attacking the constitutionality of a validly enacted statute bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt. *State* v. *Breton,* 212 Conn. 258, 269, 562 A.2d 1060 (1989); *Zapata* v. *Burns,* 207 Conn. 496, 507–508, 542 A.2d 700 (1988). We will indulge in every presumption in favor of the statute's constitutionality; *State* v. *Breton,* supra; and, when called upon to interpret a statute, we will search for "an effective and constitutional construction that reasonably accords with the legislature's underlying intent." Id.; *McConnell* v. *Beverly Enterprises-Connecticut, Inc.,* 209 Conn. 692, 705–706, 553 A.2d 596 (1989). These principles of statutory construction apply equally to criminal and to civil statutes; *State* v. *Breton,* supra; and they conjoin to commend to us a search for a judicial gloss on § 53a-167b that will effect the legislature's will in a manner consistent with constitutional safeguards.

Our analysis begins, therefore, with an evaluation of the constitutional grounds on which the trial court dismissed the charges. We consider in turn the factors that may constitute a seizure under the fourth amendment or a deprivation of privacy or liberty without due process of law under the fourteenth amendment, and we examine the balancing tests that must be applied to determine whether a violation of constitutional norms has occurred. We then turn to § 53a-167b to determine whether it can be construed to incorporate the relevant constitutional commands.

## II

## A

The fourth amendment to the federal constitution, made applicable to the states through the due process clause of the fourteenth amendment, provides in relevant part that "[t]he right of the people to be secure

in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The United States Supreme Court has recognized, in "countless decisions," that "[t]he basic purpose of this Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara* v. *Municipal Court*, 387 U.S. 523, 528, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967). The governmental purpose for such an invasion need not be an investigation of criminal activity to come within the requirements of the fourth amendment, because the law-abiding citizen has a constitutionally valid and enforceable interest in "personal and family security." Id., 530–31.

In *Terry* v. *Ohio*, 392 U.S. 1, 16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), the United States Supreme Court "emphatically reject[ed]" the claim that police conduct short of an actual arrest does not implicate the fourth amendment. Rather, the court held, "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Id. In a subsequent decision, the court reformulated the *Terry* standard to hold that "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States* v. *Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497, reh. denied, 448 U.S. 908, 100 S. Ct. 3051, 65 L. Ed. 2d 1138 (1980);[6] *State* v. *Ostroski*, 186 Conn. 287, 291–92, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982).

---

[6] Although the test formulated in *United States* v. *Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980), was endorsed only by two justices in that case, it was subsequently adopted by the court. *Immigration & Naturalization Service* v. *Delgado*, 466 U.S. 210, 215, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984); *Michigan* v. *Chesternut*, 486 U.S. 567, 573–74, 108 S. Ct. 1975, 100 L. Ed. 2d 565 (1988).

Applying these standards to the facts alleged in this case, the trial court concluded that the defendants were seized, for the purposes of the fourth amendment, when the officer ordered them to assist him. The trial court further observed that because there was no way of knowing at that time whether Jamieson had a concealed weapon, compliance with the officer's request would have entailed a risk of serious injury or death to the defendants. That risk, in the trial court's view, constituted a "seizure of the first magnitude"; see *Brower* v. *County of Inyo,* 489 U.S. 593, 595–96, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989); and subjected the officer's conduct to the reasonableness requirement of the fourth amendment. Applying a balancing test to determine the reasonableness of these seizures, the trial court reasoned that the governmental interests justifying the invocation of § 53a-167b were slight because Spratto could simply have called for the assistance of other trained police officers, while the intrusion on the defendants' interests was substantial because the command compelled untrained civilians to risk injury, and perhaps even death,[7] to subdue a misdemeanant. The trial court concluded that it was unreasonable, and a misuse of power, for an agent of the state summarily to "draft a citizen off the street and impress him into hazardous police duty to apprehend a misdemeanant."

The trial court ventured into uncharted waters by its application of the fourth amendment outside the context either of investigative searches or of seizures of a person based on some suspicion of criminal activity by the person. The court correctly noted that civil intrusions, such as administrative inspections for housing code or fire code violations, may implicate the fourth

---

[7] There was no suggestion, in the state's statement of essential facts, that Jamieson was armed, but the trial court noted that "[t]here was no way of knowing at the time whether Jamieson had a concealed weapon such as a knife or firearm."

amendment. See *Camara* v. *Municipal Court,* supra. The decisions applying the strictures of the fourth amendment in these civil contexts have, however, involved governmental activity that unquestionably constituted a "search."

Few decisions address the applicability of the fourth amendment to "seizures" of persons not themselves suspected of criminal activity.[8] This court recently has held that an order to submit to a blood grouping test for the purpose of determining paternity sufficiently implicated an individual's interests in human dignity and privacy protected by the fourth amendment to constitute the aggrievement required to maintain an appeal from the order of the Probate Court.[9] *Erisoty's Appeal from Probate,* 216 Conn. 514, 522–23, 582 A.2d 760 (1990), citing *Schmerber* v. *California,* 384 U.S. 757, 767, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966) ("compulsory administration of a blood test . . . plainly involves the broadly conceived reach of a search and seizure under the Fourth Amendment"). In contrast,

---

[8] As Professor Wayne LaFave has observed, however, the nature of the question of the applicability of the fourth amendment to seizures of the person outside the context of a criminal investigation is such that it will seldom arise: because most fourth amendment jurisprudence occurs in the context of motions to suppress evidence in criminal cases, few persons "seized" for noncriminal reasons, such as mere witnesses to criminal activity, "will have the occasion or desire to challenge" such governmental action. 3 W. LaFave, Search and Seizure (2d Ed. 1987) § 9.2 (b), p. 353.

[9] We did not hold, in *Erisoty's Appeal from Probate,* 216 Conn. 514, 582 A.2d 760 (1990), that a court-ordered blood test would inevitably violate the fourth amendment; rather, we concluded that such an intrusion into a person's body has been recognized as a seizure subject to the fourth amendment's requirement of reasonableness. Id., 521–22. Indeed, although the United States Supreme Court recognized, in *Schmerber* v. *California,* 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966), that a compelled blood test is a search and seizure subject to the fourth amendment, it found the test at issue in that case to be reasonable under the circumstances. Id., 772. "[T]he Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." Id., 768.

the Supreme Court has specifically held that some governmental orders requiring affirmative physical action on the part of an individual in the context of criminal investigations do not constitute "seizures" implicating the fourth amendment. See *United States* v. *Dionisio,* 410 U.S. 1, 5–7, 93 S. Ct. 764, 35 L. Ed. 2d 67 (1973) (requirement that individual provide a grand jury with a voice exemplar held not to be a "seizure" under the fourth amendment). No decision cited by the trial court in its memorandum of decision or by the parties on appeal has found a seizure of a person implicating the fourth amendment on facts substantially similar to this case, and at least one state court, construing a statute similar to the one at issue here, has rejected a fourth amendment challenge to the authority of police officers to command civilians to assist them. *Williams* v. *State,* 253 Ark. 973, 978–80, 490 S.W.2d 117 (1973).

At the least, the dearth of available precedents underscores that this case, on the present record, does not support a characterization of an officer's command for assistance under § 53a-167b as an indisputable "seizure" under the fourth amendment. Fourth amendment jurisprudence is pervasively fact-bound, whether the issue is the scope of the amendment itself; see, e.g., *Camara* v. *Municipal Court,* supra, 528–34 (considering factual similarities of fire, health, and housing inspections to searches for evidence of criminal activity to determine whether such administrative searches invade interests that are only "peripheral" to those protected by the fourth amendment); the definition of a "seizure"; *State* v. *Ostroski,* supra (discussing factual circumstances in which a detention had been found to constitute a "seizure"); or the appraisal of the reasonableness of a particular governmental intrusion. See, e.g., *Winston* v. *Lee,* 470 U.S. 753, 758–67, 105 S. Ct. 1611, 84 L. Ed. 2d 662 (1985) (considering factual cir-

cumstances that justify a governmental intrusion beneath the skin of a criminal defendant). The factual record here is insufficiently developed to determine whether a "seizure" occurred.

Even if we were to conclude that the officer's conduct clearly constituted a fourth amendment seizure, however, we could not sustain the trial court's judgment that such a seizure was unreasonable on the basis of the record before us. To determine the reasonableness of a particular seizure under the fourth amendment, a court must conduct a careful analysis of the particular factual circumstances surrounding a challenged governmental action. In the fourth amendment context in *Schmerber*, for instance, the Supreme Court found the compelled blood test to be reasonable under the circumstances, because (1) the probable cause that justified the arrest also suggested the relevance and likely success of the blood test; (2) the time required to secure a warrant risked the "destruction of evidence" of intoxication through the body's normal absorption or elimination of alcohol; and (3) the blood test was performed in a reasonable manner, by a trained physician in a hospital environment according to accepted medical practices. *Schmerber* v. *California,* supra, 770–72. In a subsequent decision, however, the court found unreasonable under the circumstances a judicially compelled surgical intrusion into an individual's body for the purpose of recovering a bullet that would provide evidence of a crime. *Winston* v. *Lee,* supra, 766–67. The court observed that the ordered intrusion in *Winston* was far greater than that contemplated in *Schmerber,* that the risk of medical complications was far more serious, and that the government's need for the evidence was less compelling, given the existence of other strong circumstantial evidence. *Winston* v. *Lee,* supra. The court repeatedly stressed the necessity of evaluating each fourth amend-

ment challenge to a governmental intrusion on bodily integrity on the basis of the particular facts presented. "The reasonableness of [such] intrusions . . . depends on a case-by-case approach, in which the individual's interests in privacy and security are weighed against society's interests in conducting the procedure. In a given case, the question . . . is a delicate one admitting of few categorical answers." Id., 760.

In the present case, the trial court did not conduct an evidentiary hearing to establish the factual circumstances surrounding the officer's order to the three bystanders. The balancing of societal interests against personal interests required to analyze the reasonableness of an action under the fourth amendment demands that the court consider all the relevant facts. Absent such a consideration, the court's invalidation of the statute "as applied" is in effect an invalidation of the statute on its face, and its judgment cannot be sustained.

B

The fourteenth amendment to the United States constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." Like the fourth amendment, the fourteenth amendment has been found to protect an individual's interest in bodily autonomy and privacy. The United States Supreme Court has construed the liberty interest protected by the due process clause to encompass " 'those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.' *Meyer* v. *Nebraska,* 262 U.S. 390, 399, 43 S. Ct. 625, 67 L. Ed. 1042 (1923) . . . . Among the historic liberties so protected was a right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security." *Ingraham* v. *Wright,* 430 U.S. 651, 673, 97 S. Ct. 1401, 51 L. Ed. 2d 711 (1977). In 1891, the Supreme Court observed that "[n]o right

is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pacific R. Co.* v. *Botsford,* 141 U.S. 250, 251, 11 S. Ct. 1000, 35 L. Ed. 734 (1891); *McConnell* v. *Beverly Enterprises-Connecticut, Inc.,* 209 Conn. 692, 701, 553 A.2d 596 (1989).

While minor intrusions on the personal security of an individual have been permitted to accommodate some public necessity, the Supreme Court has often observed that certain intrusions might be forbidden entirely. When, for instance, the court upheld against a due process challenge a Massachusetts statute compelling individuals to submit to vaccinations for smallpox, it nevertheless noted that the judiciary could and should intervene to prohibit a vaccination if an individual established, to a "reasonable certainty," that such vaccination "would seriously impair his health or probably cause his death." *Jacobson* v. *Massachusetts,* 197 U.S. 11, 39, 25 S. Ct. 358, 49 L. Ed. 643 (1905). One commentator has noted that most courts would be "properly reluctant" to validate on due process grounds any intrusion risking "irreversible injury to health, and the danger to life itself." L. Tribe, American Constitutional Law (2d Ed. 1988) § 15-9, p. 1333.

The government is not, to be sure, wholly without the power to compel ordinary individuals to risk their lives. The United States constitution expressly grants to Congress the power to "raise and support Armies," to "provide and maintain a Navy," and to "provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions." U.S. Const., art. I, § 8, cl. 12, 13 and 15; see also *Selective Draft Law Cases,* 245 U.S. 366, 38 S. Ct. 159, 62

L. Ed. 349 (1918). Yet, as the court below correctly concluded, the federal power to conscript individuals differs significantly from the power granted to police officers by the statute at issue here. The federal power arises from an express constitutional grant, while the police officer's power does not; and the federal power has been exercised through a highly regulated procedure that carefully defines eligibility for service, manner of selection, and available deferments and exemptions, and provides for review of individual decisions, while the peace officer's authority, under § 53a-167b, is, in the words of the trial court, inevitably "summary, *ad hoc*, and unreviewable" at the time when obedience is compelled.

Although the government can, in certain circumstances, compel individuals to risk their physical safety, it cannot compel such a risk arbitrarily. "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff* v. *McDonnell*, 418 U.S. 539, 558, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974), citing *Dent* v. *West Virginia*, 129 U.S. 114, 123, 9 S. Ct. 231, 32 L. Ed. 623 (1889). The term "due process of law" derives from the law of England, where it was intended to secure protection for the subject from the arbitrary action of the crown, but in the constitutional scheme of the United States it serves to limit the power of the legislature as well as of the executive. *Dent* v. *West Virginia*, supra, 123–24. "The great purpose of the requirement is to exclude everything that is arbitrary and capricious in legislation affecting the rights of the citizen." Id., 124. If, as the trial court assumed, § 53a-167b authorizes arbitrary orders for assistance by police officers on the beat, then the statute would be vulnerable to a challenge under the due process clause of the fourteenth amendment. This is particularly true because, by the nature of the statute involved, an individual cannot seek

review of an officer's command before deciding whether to risk physical injury or death by aiding the officer or to risk the criminal penalties for refusing to assist.

Because the due process clause has been repeatedly construed to protect an interest in a person's bodily security, the defendants' substantive due process claim is more plausible than the claim they have asserted under the fourth amendment. We are nevertheless persuaded that the trial court's invalidation of § 53a-167b on due process grounds is premature, because the court did not consider whether the statute could fairly be given an appropriately narrowing construction to preclude an arbitrary deprivation of liberty. Courts "are bound to assume that the legislature intended, in enacting a particular law, to achieve its purpose in a manner which is both effective and constitutional"; *Moscone* v. *Manson,* 185 Conn. 124, 128, 440 A.2d 848 (1981); and this presumption of constitutionality imposes upon the trial court, as well as this court, the duty to construe statutes, whenever possible, in a manner that comports with constitutional safeguards of liberty.

We note, in addition, that the present record is inadequate to establish a factual basis for the defendants' asserted liberty interests, for essentially the same reasons that it is inadequate to support their claims under the fourth amendment. Decisions construing substantive liberty interests protected by the due process clause emphasize the fact-bound and relative nature both of the interests protected and of the procedural protections required by the constitution. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey* v. *Brewer,* 408 U.S. 471, 481, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972). As a general rule, the greater the intrusion on the individual's interest, the more urgent society's

interest must be in compelling it. Due process analysis requires a fact-based balancing of the importance of the individual's interests against the needs of society to infringe upon those interests. " 'Due process analysis has not been reduced to any formula; its content cannot be determined by reference to any code. . . . [T]he full scope of the liberty guaranteed by the Due Process Clause . . . is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints . . . and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment.' " *Moore* v. *East Cleveland,* 431 U.S. 494, 501–502, 97 S. Ct. 1932, 52 L. Ed. 2d 531 (1977) (plurality opinion), quoting *Poe* v. *Ullman,* 367 U.S. 497, 542–43, 81 S. Ct. 1752, 6 L. Ed. 2d 989 (1961) (Harlan, J., dissenting). Because the trial court did not receive evidence that could support the defendants' claims under a due process analysis, its invalidation of the statute "as applied" cannot be sustained.

## III

The defendants in this case have raised serious constitutional challenges to the validity of General Statutes § 53a-167b and to the power of the state to compel ordinary citizens to risk their physical safety to assist a peace officer in the arrest of a misdemeanant. Whatever the strength of their arguments, we conclude that we need not reach the merits of these issues because the statute is capable of a construction that will avoid constitutional jeopardy. "Established wisdom counsels us to exercise 'self-restraint' so as 'to eschew unnecessary determinations of constitutional questions.' *State* v. *Torres,* 206 Conn. 346, 362, 538 A.2d 185 (1988); *Negron* v. *Warden,* 180 Conn. 153, 166, 429 A.2d 841

(1980)." *McConnell* v. *Beverly Enterprises-Connecticut, Inc.,* supra, 706. It is nevertheless relevant to our construction of the statute that our interpretation avoids constitutional perils. Id.

Section 53a-167b provides, in its entirety: "(a) A person is guilty of failure to assist a peace officer or fireman when, commanded by a peace officer or fireman authorized to command assistance, he refuses to assist such officer or fireman in the execution of his duties. (b) Failure to assist a peace officer is a class A misdemeanor."[10] As the trial court noted, the statute applies only to peace officers "authorized to command assistance"; it does not of itself authorize such commands. General Statutes § 7-276, however, provides that members of municipal police departments "shall have all such authority with respect to the service of criminal process and the enforcement of the criminal laws as is vested by the general statutes in police officers and constables," and General Statutes § 7-90 provides that "[a]ny constable, *when necessary,* may command any person to assist him in the execution of the duties of his office." (Emphasis added.) Because the constable statute provides, by reference, the statutory authority that permits municipal police officers to command assistance, it is plausible to infer that the legislature intended to limit the authority of police officers to command assistance only to cases of demonstrated necessity.

This construction comports with the history of the statute as reflected in its common law origins and in the codification and interpretation, in other states, of the common law concept of the posse comitatus ("the power of the county") that underlies it. The basic con-

---

[10] A class A misdemeanor is punishable by a fine of up to $1000; General Statutes § 53a-42; and by imprisonment for a term not to exceed one year. General Statutes § 53a-36.

cept that every citizen can be compelled to assist in the pursuit or apprehension of suspected criminals has ancient Saxon origins, predating the Norman Conquest, and, as the trial court observed, derives from a time in which the public peace depended upon the ability of the populace to summon their neighbors, through the raising of the "hue and cry," to come to their assistance when a crime had occurred. See 2 F. Pollock & F. W. Maitland, The History of English Law (2d Ed. 1899) pp. 578–79; *Riker* v. *New York,* 204 Misc. 878, 126 N.Y.S.2d 229 (1953), aff'd, 286 App. Div. 808, 143 N.Y.S.2d 620 (1955). As the responsibility for keeping the peace shifted, over the centuries, to sheriffs, constables, and eventually to trained professional police departments, the power of those law enforcement officials to command the assistance of citizens was recognized both in statutes and in the common law. The power of constables to command assistance was codified in Connecticut as early as 1650; 1 Public Records of the Colony of Connecticut 509, 522 (1850); and the colonial statutes granting such authority have survived, in modified form, to the present day, both in Connecticut[11] and in most other states.[12]

---

[11] See, e.g., General Statutes § 6-31 (sheriffs) and § 7-90 (constables).

[12] Most states have codified the concept of the posse comitatus in some form. See, e.g., Ala. Code § 13A-10-5 (1982); Alaska Stat. § 11.56.720 (1989); Ariz. Rev. Stat. Ann. § 13-2403 (West 1989); Ark. Code § 5-54-109 (1987); Cal. Penal Code § 150 (1987), rev. July 16, 1990, to expand classes of officers who are authorized to command assistance, 1990 Cal. Adv. Legis. Serv. c. 273, § 1 (Deering); Colo. Rev. Stat. § 18-8-107 (1986).

Some states, like Arizona, have expressly codified a requirement of reasonableness. Ariz. Rev. Stat. Ann. § 13-2403 (West 1988) provides that "[a] person commits refusing to aid a peace officer if, upon a reasonable command by a person reasonably known to be a peace officer, such person knowingly refuses or fails to aid such peace officer in: (1) Effectuating or securing an arrest; or (2) Preventing the commission by another of any offense." Arizona's statute also protects a person who obeys an officer's command for assistance from civil liability "for damages resulting therefrom, pro-

Such statutes, however, have not been construed to confer unbounded discretion upon the peace officer. In 1894, the Supreme Court of Alabama, construing a statute which, like our § 53a-167b, made it a misdemeanor to refuse to assist a peace officer, required the officer "to have proper regard for the life and safety of the party whom he calls to aid him in making an arrest, and not recklessly, and for no good purpose, to expose his life and limb to useless danger." *Dougherty* v. *State,* 106 Ala. 63, 66, 17 So. 393 (1894). A more recent decision of the Supreme Court of Arkansas rejected constitutional challenges to a similar statute under the fourth and fourteenth amendments on the ground that no evidence had been presented to suggest that the officer requesting the assistance of two civilians had acted "arbitrarily or recklessly" in the circumstances of that case. *Williams* v. *State,* 253 Ark. 973, 979–80, 490 S.W.2d 117 (1973).

In light of our own constitutional constraints and the experience of courts in other states, we conclude that § 53a-167b authorizes a peace officer to command the assistance of a civilian only when such assistance is both demonstrably necessary and reasonable under all the

---

vided such person acted reasonably under the circumstances known to him at the time." Id.

Other states, such as New York and Delaware, make it a misdemeanor to refuse an officer's command for assistance only if the refusal is unreasonable. N.Y. Penal Law § 195.10 (McKinney 1988); Del. Code Ann. tit. 11, § 1241 (1987).

Still other states authorize an officer to command assistance but do not penalize, or penalize only by a minimal fine, a refusal to aid an officer. For instance, the "official revision comment" to Louisiana's statute notes that former provisions that criminalized a refusal to aid an officer are omitted from the present statute "as being out of accord with present-day conditions." La. Code Crim. Proc. Ann. art. 219 (West 1967). New Hampshire provides that "[e]very officer in the execution of his office in a criminal case may require suitable aid, and if any person, when required, shall not give such aid, he shall be fined not more than $10." N.H. Rev. Stat. Ann. § 594.6 (1986).

circumstances. Any determination of the necessity and the reasonableness of any particular command for assistance must rest on reasoned analysis of a number of key factual considerations. At a minimum, the court will need a factual record to evaluate the following factors: the urgency of the situation giving rise to a command for assistance; the availability of other trained law enforcement officers, rather than untrained civilians, to come to an officer's aid; the nature of the assistance sought; the appropriateness of commandeering the assistance of these individuals; the provocativeness of the situation in which aid is sought;[13] the presence or threat of the use of weapons;[14] and the risk of injury or death to the officer, to the individual being ordered to assist, and to any other parties present. The court must also consider, as evidence of the reasonableness of the command to assist, the reasonableness of the officer's actions in the underlying situation for

[13] The context in which the command to assist is issued can of itself determine the reasonableness of the command. In *Dougherty* v. *State,* 106 Ala. 63, 17 So. 393 (1894), the Supreme Court of Alabama reversed the conviction of a man convicted of failing to assist a deputy sheriff because the trial court had failed to instruct the jury that the defendant should be acquitted if his assistance would have been both futile and dangerous. In that case, a sheriff had pursued a man suspected of theft into a store and had commanded the store owner to assist him in arresting the man. Testimony at trial tended to show that a large group of men were within the store "who showed a disposition to defend and assist" the suspect, that the suspect was armed with a knife, and that the store owner commanded to assist the sheriff was unarmed. Id., 64–65. The court, in reversing the conviction, implied that if the jury had found the testimony credible, it would have had a duty to acquit the store owner of failure to assist. Id., 66–67.

[14] The trial court in this case noted that, while citizens in earlier days were expected to maintain weapons in their households to protect the peace, Connecticut now prohibits citizens from possessing weapons without written permits. See, e.g., General Statutes § 53-206 (prohibiting the carrying of dangerous weapons without a permit), § 29-35 (prohibiting the carrying of a pistol or revolver without a permit), and § 29-38 (prohibiting weapons in vehicles without a proper permit). As the trial court commented, the law-abiding citizen whose assistance is sought is far less likely to be carrying a weapon than is the person whom an officer seeks help in subduing.

which he sought assistance. See generally *Terry* v. *Ohio,* supra; *State* v. *Lamme,* 216 Conn. 172, 579 A.2d 484 (1990). These factors are not intended to be exclusive; other relevant facts should be admitted and addressed as circumstances require.

Because we construe § 53a-167b to authorize an officer to command assistance only when necessary and reasonable, moreover, the necessity and the reasonableness of the command must be considered to be elements of the misdemeanor of failure to assist. In order to convict an individual of a class A misdemeanor under § 53a-167b, the state bears the burden of proving these elements beyond a reasonable doubt, just as it must prove all other elements of the misdemeanor.[15]

We note, in addition, that because § 53a-167b is in essence a codification of an ancient common law practice, it should be construed to allow the defenses traditionally available at common law. It is a commonplace of statutory construction that statutes in derogation of the common law should not be construed to alter the common law further than their words demand. *State* v. *Nugent,* 199 Conn. 537, 548, 508 A.2d 728 (1986). Among the common law defenses traditionally applicable to the charge of failure to assist a peace officer is the defense of physical incapacity. *Regina* v. *Brown,* 174 Eng. Rep. 522, 524 (1841). Other states have construed their statutes to include such a common law defense. See, e.g., *Greenwood* v. *Smothers,* 103 Ark. 158, 160, 146 S.W. 109 (1912).

Because we construe General Statutes § 53a-167b to authorize an officer to command assistance in the execution of his duties only when circumstances render the command both necessary and reasonable, we conclude

---

[15] As part of its customary burden of proof in a criminal case, the state must prove that the officer was identifiably a peace officer, and that the officer "commanded" rather than merely requested assistance.

that the statute is not facially unconstitutional under the fourth or fourteenth amendments. Accordingly, we reverse the judgment of the trial court dismissing the information in each case, and we remand the cases for further proceedings in accordance with our construction of the statute.

The judgments are reversed and the cases are remanded for further proceedings consistent with this opinion.

In this opinion the other justices concurred.