The Honorable Larry Jegley, Prosecuting Attorney Sixth Judicial District 122 South Broadway Little Rock, AR 72201
Dear Mr. Jegley:
You have requested my opinion on certain issues related to chemical testing for the purpose of determining alcohol and drug levels in a suspect's body.
You indicate that your questions are related to situations in which police officers arrive at the scene of a motor vehicle accident and find a dead or dying victim of a suspected drunk driver. The suspected drunk driver refuses to submit to chemical testing pursuant to A.C.A. §5-65-208, presumably under the authority of A.C.A. § 5-65-205.
Your questions are:
 (1) Are the provisions of A.C.A. § 5-65-208(a) mandatory? (I.e., are police required to test suspects under the described facts? Or, alternatively, does the suspect's refusal under A.C.A. § 5-65-205
essentially nullify the testing provisions of A.C.A. § 5-65-208?)
 (2) If Section -208 is not nullified by Section -205, what action should police take to enforce the provisions of Section -208? (Should they seek a court order or warrant if a driver refuses consent to testing (although dissipating drugs or alcohol create a time crunch, often late at night?) May officers use reasonable force, if needed to obtain the sample, either with or without court order or warrant?
 (3) If force is permitted either with or without a warrant, are there any civil liability issues for police agencies enforcing the requirements of A.C.A. § 5-65-208, assuming it is mandatory?
 (4) If Section -208 is mandatory, may the investigating officers and prosecutors use the Section -208 test results to prosecute criminal offenses, or is the purpose of this particular law solely for gathering statistics (or, perhaps, to get federal dollars to fund state programs related to DWI)?
 (5) Are formal charges under Section -205 still permitted? What is the sanction for refusal to submit other than license seizure and administrative action?
RESPONSE
Question 1 — Are the provisions of A.C.A. § 5-65-208(a) mandatory?(I.e., are police required to test suspects under the described facts?Or, alternatively, does the suspect's refusal under A.C.A. § 5-65-205essentially nullify the testing provisions of A.C.A. § 5-65-208?)
It is my opinion that the provisions of A.C.A. § 5-65-208(a) are mandatory. That statutory section states:
 (a) When the driver of a motor vehicle is involved in an accident resulting in loss of human life or where there is reason to believe death may result, and there exists probable cause to believe that the driver is guilty of a violation of the state's law prohibiting driving while under the influence, in addition to penalties established elsewhere under state law, a test or tests of the driver's blood, breath, or urine shall be administered to the driver, even if fatally injured, to determine the presence of and percentage of concentration of alcohol or drugs, or both, in the person's body.
A.C.A. § 5-65-208 (emphasis added).
The Arkansas Supreme Court has consistently held that the use of the term "shall" in a statute reflects a legislative intent that compliance with the statute be mandatory. See, e.g., Middleton v. Lockhart,344 Ark. 572, 584, 43 S.W.3d 113, 122 (2001). When I apply that rule of statutory construction to the language of A.C.A. § 5-65-208(a), I must conclude that the provisions thereof are mandatory.
You have also asked whether a driver's refusal, pursuant to A.C.A. §5-65-205, to submit to the testing that is required by A.C.A. § 5-65-208
essentially nullifies the requirements of Section -208. The answer to this question is not clear under current law. However, I believe that if a court were faced with the question, it would conclude that a driver's refusal to submit to testing does not nullify the requirements of Section -208. The reasoning that supports that conclusion is explained below.
Section 205 states in pertinent part:
 (a) If a person under arrest refuses upon the request of a law enforcement officer to submit to a chemical test designated by the law enforcement agency, as provided in § 5-65-202, none shall be given, and the person's motor vehicle operator's license shall be seized by the law enforcement officer, and the officer shall immediately deliver to the person from whom the license was seized a temporary driving permit, as provided by § 5-65-402.
A.C.A. § 5-65-205(a) (emphasis added).
As you have noted, the problem with the interaction between Section -205 and Section -208 arises out of the phrase "none shall be given," as used in Section -205 above. If testing is mandatory under Section -208, a genuine question arises as to the meaning of the phrase "none shall be given," as used in Section -205. The matter is further complicated by the provisions of A.C.A. § 5-65-202, which states:
 (a) Any person who operates a motor vehicle or is in actual physical control of a motor vehicle in this state shall be deemed to have given consent, subject to the provisions of § 5-65-203, to a chemical test or tests of his or her blood, breath, or urine for the purpose of determining the alcohol or controlled substance content of his or her breath or blood if:
 (1) The driver is arrested for any offense arising out of acts alleged to have been committed while the person was driving while intoxicated or driving while there was an alcohol concentration of eight-hundredths (0.08) or more in the person's breath or blood; or
 (2) The person is involved in an accident while operating or in actual physical control of a motor vehicle; or
 (3) At the time the person is arrested for driving while intoxicated, the law enforcement officer has reasonable cause to believe that the person, while operating or in actual physical control of a motor vehicle, is intoxicated or has an alcohol concentration of eight-hundredths (0.08) or more in the person's breath or blood.
 (b) Any person who is dead, unconscious, or otherwise in a condition rendering him or her incapable of refusal shall be deemed not to have withdrawn the consent provided by subsection (a) of this section, and the tests may be administered subject to the provisions of § 5-65-203.
A.C.A. § 5-65-202.
The concept of implied consent in Section -202 and the mandatory testing of Section -208 do not appear to be consistent with the "none shall be given" language of Section -205. Yet under a well-established rule of statutory construction, the Arkansas Supreme Court has consistently held that if two statutes address the same subject, they should be read together and harmonized, if possible, in such a way that both can be given effect. See, e.g., Ark. Soil, Water Conserv. v. City ofBentonville, 351 Ark. 289, 300, 92 S.W.3d 47, 54 (2002); Vittitow v.Central Maloney, Inc., 69 Ark. App. 176, 182, 11 S.W.3d 12, 17 (2000).
The history of the above-quoted provisions indicates that they were not intended to conflict with one another, and that none of them was intended to impliedly repeal either of the others. Particularly telling in this respect is the fact that Section -202, regarding implied consent to testing, and Section -205, providing that no test shall be given if a person refuses, were originally enacted as a part of the same act,Act 106 of 1969. See Acts 1969, No. 106, § 1(a) and (d). Moreover, although both provisions have been amended several times over the years, the concept of implied consent, as well as the "none shall be given" language, have consistently been retained. Also telling is the fact that Section -205, containing the "none shall be given" language, was thoroughly re-written (yet retaining the "none shall be given" language) in 1995, during the same legislative session that Section -208, providing for mandatory testing, was enacted. Indeed, these provisions were enacted within a few days of one another. See Acts 1995, No. 802, §§ 4 and 5 (enacted on March 27, 1995), Acts 1995, No. 711, § 2 (enacted on March 21, 1995), and Acts 1995, No. 1105, § 2 (enacted on April 10, 1995). Not only is the General Assembly presumed, in enacting legislation, to be aware of prior legislation on the same subject, see Gaines v. State, 354 Ark. 89, 100,118 S.W.3d 102, 108 (2003), but there can be little doubt of that awareness when the General Assembly enacts the two provisions in question during the same session, as it did in 1995, or particularly when it includes the two provisions in question in the same act, as it did inAct 106 of 1969.
These factors about the history of Sections -202, -205, and -208 provide a particularly compelling reason to find a way to harmonize the three provisions and to interpret them so that all can be given effect if possible.
In my opinion, it is possible to interpret the three consistently so that all can be given effect, if they are read together as follows: Section -205 is interpreted to operate as an exception to Section -202. Section -208, in turn, is interpreted to operate as an exception to Section -205. More specifically, under this interpretation, Section -202 creates implied consent to testing, but a driver, acting on the basis of the exception created by Section -205, can nevertheless refuse to submit to testing in cases not involving the loss of human life, or in cases in which there is no reason to believe that such a loss may result. Section -208, being a more specific statute, carves out a specific circumstance (the circumstance involving the loss or expected loss of human life) in which a driver cannot refuse testing. See, e.g., Raley v. Wagner,346 Ark. 234, 240, 57 S.W.3d 683, 687 (2001) (if two acts address the same subject and one is more specific than the other, the more specific act should govern). Under this interpretation, implied consent is preserved, as is a driver's general ability to refuse to submit in cases not involving the loss or expected loss of human life. At the same time, by overriding the driver's ability to refuse consent in cases involving the loss or expected loss of human life, this interpretation also preserves Section 208's goal of collecting data on DWI cases involving the loss or expected loss of human life. In this way, this interpretation not only satisfies the goal of upholding the effectiveness of all three statutes, it also complies with the principle that legislation should not be interpreted in a manner that renders the legislation meaningless or that brings about unworkable consequences. See, e.g., Citizens To Establish aReform Party v. Priest, 325 Ark. 257, 264-65, 926 S.W.2d 432, 436
(1996). All three statutes remain in effect, meaningful, and workable.[1]
Question 2 — If Section -208 is not nullified by Section -205, whataction should police take to enforce the provisions of Section -208?(Should they seek a court order or warrant if a driver refuses consent totesting (although dissipating drugs or alcohol create a time crunch,often late at night?)) May officers use reasonable force, if needed toobtain the sample, either with or without court order or warrant?
It is my opinion, as noted in response to Question 1, that a suspected drunk driver cannot refuse to submit to the test in a situation implicating Section -208. If the driver attempts to refuse to submit to the test, the police officer must comply with the requirements of the Fourth Amendment governing searches and seizures. Thus, the officer will be required to obtain a warrant in order to proceed with having the test administered, unless an exception to the warrant requirement exists under the particular circumstances of the case.
The Arkansas Supreme Court recently stated: "The law is settled that the taking of blood by a law enforcement officer amounts to a Fourth Amendment search and seizure." Haynes v. State, ___ Ark. ___, ___,127 S.W.3d 456, 461 (2003), citing Schmerber v. California, 384 U.S. 757
(1966); Russey v. State, 336 Ark. 401, 985 S.W.2d 316 (1999); Mills v.State, 322 Ark. 647, 910 S.W.2d 682 (1995). Accordingly, a warrant is required unless an exception to the warrant requirement can be established. For example, a warrant is not necessary if the suspect gives his consent to the test. E.g., Russey, supra.[2] Another example of a situation in which a warrant may not be necessary is a situation involving certain exigent circumstances, such as those in which the opportunity to administer the test will exist only for a short time. For example, in Ray v. State, 304 Ark. 489, 803 S.W.2d 894 (1991), the court held that the warrantless administering of a gunpowder tests on the hands of a shooting suspect did not violate the Fourth Amendment in light of the exigent circumstances of the case. The court pointed out that "[h]ad appellant washed his hands, the chance to conduct the test would have been gone." Ray, 304 Ark. at 498, 803 S.W.2d at 899.
As a general matter, the question of whether the warrantless administering of a blood alcohol test is justified must be addressed on a case-by-case basis, taking into consideration the particular circumstances of each case. Schmerber v. California, 384 U.S. 757, 772
(1966). In Schmerber, the U.S. Supreme Court provided some guidelines for making this determination. There, the defendant was hospitalized following an accident involving an automobile that he had apparently been driving. A police officer smelled liquor on the defendant's breath and noticed other symptoms of drunkenness at the accident scene. The officer placed him under arrest at the hospital. At the officer's direction, a physician took a blood sample from the defendant despite his refusal on advice of counsel to give his consent for the blood test. A report of the chemical analysis of the blood, which indicated intoxication, was admitted into evidence at trial over the defendant's objection. He was convicted of driving while intoxicated. On appeal, he argued that the administering of the blood test without his consent constituted an unreasonable search and seizure in violation of the Fourth Amendment. The Court held that the taking of blood is subject to the requirements of the Fourth Amendment. However, it held that under the circumstances of the case, administering the test without a warrant was justified. The Court explained:
 The officer in the present case, however, might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened "the destruction of evidence," Preston v. United States, 376 U.S. 364, 367. We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system. Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant. Given these special facts, we conclude that the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest.
Schmerber, 384 U.S. at 770.
The Court also pointed out other factors that supported its holding. First, the test chosen to measure the defendant's blood alcohol level was reasonable, effective, required extracting a minimal amount of blood, and involved virtually no risk, trauma, or pain. In addition, the circumstances did not involve any objection by the defendant on grounds of fear, health concerns, or religious scruples. Finally, the test was performed in a reasonable manner, by a physician in a hospital environment, according to accepted medical practices. The Court specifically acknowledged that serious questions could arise if the test were administered by non-medical personnel in a non-medical setting.
The Schmerber Court's discussion thus provides some guidance for determining the appropriate manner of handling situations such as the one you have described.
The Schmerber Court's guidance is also pertinent to the question of whether law enforcement officers are justified in using force to obtain a blood sample. Indeed, the Court grounded its analysis of the case upon the touchstone of reasonableness, stating: "[T]he Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." Schmerber, 384 U.S. at 768. This element of reasonableness is central to the question of whether the use of force is justified. Addressing this point in Graham v. Connor, 490 U.S. 386
(1989), the U.S. Supreme Court stated:
 The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. See Terry v. Ohio, 392 U.S. 1, 20-22
(1968)]. . . . With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," Johnson v. Glick, 481 F.2d, at 1033, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation.
 As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. See Scott v. United States, 436 U.S. 128, 137-139 (1978); see also Terry v. Ohio, [392 U.S. 1, 21
(1968)] (in analyzing the reasonableness of a particular search or seizure, "it is imperative that the facts be judged against an objective standard").
Graham v. Connor, 490 U.S. 386, 396 (1989).
Clearly, the pertinent inquiry concerning the justifiability of the use of force will be whether the force used in the given situation is reasonable. See also A.C.A. § 5-2-601, which outlines some of the circumstances under which law enforcement officers are deemed to be justified in using force.
Having discussed Schmerber, I must point out that an argument could be posited against the case-by-case approach outlined therein. The U.S. Supreme Court has recognized that some circumstances should be endorsed as categorically "reasonable" for Fourth Amendment purposes. For example, in Vernonia School Dist. 47J v. Acton, 515 U.S. 646 (1995), the Court upheld, against a Fourth Amendment challenge, a school district's random drug-testing policy for student athletes. In evaluating the reasonableness of the policy, the Court balanced the affected privacy interest against the legitimacy of the governmental interest served by the policy. Similarly, in Skinner v. Railway Labor Executives' Assn.,489 U.S. 602 (1989), the Court upheld, against a Fourth Amendment challenge, federal regulations permitting drug testing of certain railroad employees. The Court found that the government interest in such testing outweighed the employees' privacy interests affected thereby.
The validity under the Fourth Amendment of the testing that is mandated by A.C.A. § 5-65-208 has not been addressed by a court. It is conceivable that a court, faced with the question, could conclude that the administering of chemical tests in cases involving alcohol-related accidents resulting in death (i.e., the cases subject to Section -208) should be endorsed as categorically reasonable for Fourth Amendment purposes, and that a case-by-case evaluation is not necessary. In order to reach this conclusion, the court must find that the state's interest in obtaining the test results in such cases outweighs the individual drivers' privacy interests. Such an argument could be compelling. However, until such a precedent regarding Section -208 is forthcoming, a case-by-case evaluation must be undertaken.
Question 3 — If force is permitted either with or without a warrant, arethere any civil liability issues for police agencies enforcing therequirements of A.C.A. § 5-65-208, assuming it is mandatory?
The answer to this question will depend upon the type of liability to which you are referring.
Law enforcement officers, as employees of the state or of political subdivisions of the state, are entitled to certain limited immunity from suit for some types of acts that are performed in the course of their official duties.
Law enforcement officers who are employees of the State fall within the provisions of A.C.A. § 19-10-305, which states:
 (a) Officers and employees of the State of Arkansas are immune from liability and from suit, except to the extent that they may be covered by liability insurance, for damages for acts or omissions, other than malicious acts or omissions, occurring within the course and scope of their employment.
A.C.A. § 19-10-305(a).
It should be noted that the above-quoted grant of immunity applies generally to nonmalicious acts, but that it contains an exception to the extent of liability insurance coverage. Therefore, while law enforcement officers generally cannot be held liable for nonmalicious acts, they can be held liable for such acts to the extent that such acts are covered by liability insurance. They can also, of course, be held liable for malicious acts. See Beaulieu v. Gray, 288 Ark. 395, 399, 705 S.W.2d 880,882 (1986).
Law enforcement officers who are employees of cities and counties fall within the provisions of A.C.A. § 21-9-301, which states:
 It is declared to be the public policy of the State of Arkansas that all counties, municipal corporations, school districts, special improvement districts, and all other political subdivisions of the state shall be immune from liability and from suit for damages, except to the extent that they may be covered by liability insurance. No tort action shall lie against any such political subdivision because of the acts of its agents and employees.
A.C.A. § 21-9-301.
Although A.C.A. § 21-9-301 speaks only in terms of the immunity of the political subdivision itself, the Arkansas Supreme Court has interpreted the statute as extending immunity to officers and employees of the political subdivisions as well when they negligently commit acts or omissions in their official capacities. See, e.g., Fritzinger v. Beene,80 Ark. App. 416, 97 S.W.3d 440 (2003), citing Autry v. Lawrence,286 Ark. 501, 696 S.W.2d 315 (1985) (stating that it was the intent of the General Assembly in enacting A.C.A. § 21-9-301 to grant immunity to municipal agents and employees for acts of negligence committed in their official capacities). Accordingly, a claimant may be able to sue city or county law enforcement officers personally for intentional or malicious acts, or for negligent acts not committed in their official capacities. However, the claimant cannot sue the city or county officer for negligence that was committed in the officer's official capacity (except to the extent that such acts are covered by liability insurance).
In addition to these two types of statutory immunity, law enforcement officers may be entitled to "qualified immunity." Under the doctrine of qualified immunity, an individual is immune from suit if the actions complained of were taken in good faith in the performance of one's duties, and the acts do not violate any clearly established constitutional right. Harlow v. Fitzgerald, 457 U.S. 800 (1982). The test for the applicability of qualified immunity turns upon the "objective legal reasonableness of the action," assessed in light of legal rules that were "clearly established" at the time the action was taken. SeeAnderson v. Creighton, 483 U.S. 635 (1987). The immunity is "qualified" because it does not obtain where the activity is in violation of clearly established law that a reasonable person would have known. Fegans v.Norris, 351 Ark. 200, 89 S.W.3d 919 (2002); Robinson v. Beaumont,291 Ark. 477, 725 S.W.2d 839 (1987); Matthews v. Martin, 280 Ark. 345,658 S.W.2d 374 (1983).
The question of whether a law enforcement officer is entitled to any type of immunity from a claim arising out of the execution of the testing requirements of A.C.A. § 5-65-208 will depend largely upon the facts of each case, including the particular damage claimed, whether that damage resulted from an act committed by the officer in his official capacity, and whether the officer acted negligently or maliciously.
Question 4 — If Section -208 is mandatory, may the investigating officersand prosecutors use the Section -208 test results to prosecute criminaloffenses, or is the purpose of this particular law solely for gatheringstatistics (or, perhaps, to get federal dollars to fund state programsrelated to DWI)?
It is my opinion that the law does not clearly answer this question, and the issue could benefit from legislative clarification.
The plain language of Section -208 certainly seems to indicate an intent that the results of tests administered under the authority of Section -208 not be used for purposes other than those stated in the statute. More specifically, Section -208, after stating the various aspects of the testing requirement, goes on to state:
 (c) The results of the analyses required by this section shall be reported to the Department of Arkansas State Police and may be used by state and local officials only for statistical purposes that do not reveal the identity of the deceased person.
A.C.A. § 5-65-208(c).
Despite this plain language, a practical problem may arise when Section -208 is read in conjunction with A.C.A. § 5-65-206, which specifically addresses the use of test result information in criminal prosecutions. The pertinent portion of Section -206 states:
 (d)(1)(A) The records and reports of certifications, rules, evidence analysis, or other documents pertaining to work performed by the Office of Alcohol Testing of the Department of Health under the authority of this chapter shall be received as competent evidence as to the matters contained in them in the courts of this state, subject to the applicable rules of criminal procedure when duly attested to by the program director or his assistant, in the form of an original signature or by certification of a copy.
(B) These documents shall be self-authenticating.
 (2) However, the instrument performing the chemical analysis shall have been duly certified at least one (1) time in the last three (3) months preceding arrest, and the operator of the instrument shall have been properly trained and certified.
 (3) Nothing in this section shall be deemed to abrogate a defendant's right of cross-examination of the person who performs the calibration test or check on the instrument, the operator of the instrument, or a representative of the Office of Alcohol Testing.
 (4) The testimony of the appropriate analyst or official may be compelled by the issuance of a proper subpoena given ten (10) days prior to the date of hearing or trial, in which case the records and reports shall be admissible through the analyst or official, who shall be subject to cross-examination by the defendant or his counsel.
A.C.A. § 5-65-206(d).
This statute authorizes the use in criminal prosecutions of the results of chemical tests authorized under authority of the subchapter. See,e.g., A.C.A. § 5-65-202. Moreover, the Arkansas Supreme Court has explicitly upheld the admissibility of the results of these tests against certain kinds of challenges. See Steele v. State, 284 Ark. 340,681 S.W.2d 354 (1984); Mercer v. State, 256 Ark. 814, 510 S.W.2d 539 (1974).
Even if Section -208 is viewed as an exception to Section -206, the practical problem that may arise is that one test may be administered for the purpose of complying with more than one statute. For example, the results of a test that is administered under the authority of the implied consent statute (Section -202) may also be reported for purposes of complying with Section -208. That is, the appropriate authorities may choose to administer only one test for purposes of complying with the two statutes, rather than administering two different tests. If only one test is administered, it is difficult to ascertain how the results of that one test could be expressly admissible under Section -206, but not be admissible under Section -208.
I can, accordingly, give no definitive answer to your question. Legislative clarification is warranted.
Question 5 — Are formal charges under Section -205 still permitted? Whatis the sanction for refusal to submit other than license seizure andadministrative action?
It is my opinion that formal criminal charges under Section -205 are permitted.
Although Section -205, as well as other statutory provisions, establish extensive administrative procedures to impose sanctions for refusal to submit to chemical testing, see, e.g., A.C.A. §§ 5-65-104 and -402, a refusal to submit nevertheless constitutes a criminal offense. This conclusion is based upon numerous sources, discussed below.
Section -205, which is part of the criminal code, refers to the act of refusal to submit to chemical testing as an "offense." The term "offense" is defined in the criminal code as follows:
 (a) An offense is conduct for which a sentence to a term of imprisonment or fine or both is authorized by statute.
(b) Offenses are classified as follows:
(1) Felonies;
(2) Misdemeanors;
(3) Violations.
 (c) Nothing in this code shall be construed to limit the power of a court to punish for contempt or to employ any sanction authorized by law for the enforcement of an order, judgment, or decree.
A.C.A. § 5-1-105. In Hatley v. State, 68 Ark. App. 209, 5 S.W.3d 86
(1999), the Arkansas Court of Appeals pointed out in a footnote that the act of refusal to submit constitutes a "violation," which is defined in A.C.A. § 5-1-108, as follows:
 (a) An offense is a violation if it is so designated by this code or by a statute not a part of this code.
 (b) Regardless of any designation appearing in the statute defining an offense, an offense is a violation for purposes of this code if the statute defining the offense provides that no sentence other than a fine, or fine or forfeiture, or civil penalty is authorized upon conviction.
A.C.A. § 5-1-108. See Hatley at Note 1. Accord, Op. Att'y Gen. No.2000-252.
The fact that refusal to submit is a criminal offense is bolstered by the fact that A.C.A. § 5-65-402, which sets forth detailed administrative procedures to be followed in imposing sanctions for refusal to submit, contains the following provision:
 (d)(1) Any decision rendered at an administrative hearing held under this section shall have no effect on any criminal case arising from any violation of § 5-65-103, § 5-65-205, § 5-65-303, § 5-65-310, § 27-23-114(a)(1), § 27-23-114(a)(2), or § 27-23-114(a)(5).
 (2) Any decision rendered by a court of law for a criminal case arising from any violation of § 5-65-103, § 5-65-205, § 5-65-303, § 5-65-310, § 27-23-114(a)(1), § 27-23-114(a)(2), or § 27-23-114(a)(5) shall affect the administrative suspension, disqualification, or revocation of the driver's license as follows:
 (A) A plea of guilty or nolo contendere or a finding of guilt by the court will have no effect on any administrative hearing held under this section;
 (B)(i) An acquittal on the charges or a dismissal of charges will serve to reverse the suspension, disqualification, or revocation of the driver's license suspended or revoked under this section.
 (ii) The office shall reinstate the person's driver's license at no cost to the person, and the charges shall not be used to determine the number of previous offenses when administratively suspending, disqualifying, or revoking the driving privilege of any arrested person in the future; and
 (C) The office shall convert any initial administrative suspension or revocation of a driver's license for violating § 5-65-103 to a suspension or revocation for violating § 5-65-303, if the driver is convicted of violating § 5-65-303 instead of § 5-65-103.
A.C.A. § 5-65-402(d).
This provision clearly indicates that the act of refusal to submit is deemed to be a criminal offense that is subject to criminal sanctions. Moreover, numerous statutes refer to "arrests for a violation of . . . A.C.A. § 5-65-205 [refusal to submit]." See, e.g., A.C.A. §5-65-205(d)(2); A.C.A. § 5-65-304(c)(2); A.C.A. § 5-65-310(c)(2); A.C.A. § 5-65-402(a)(1)(A).
In addition, the Arkansas Supreme Court, in interpreting a previous version of Section -205, stated:
 [T]he legislature, in exercising its police power to regulate the privilege of operating a motor vehicle, has chosen to make refusing to submit to a breathalyzer test part of our criminal code. Thus, a conviction for refusal to submit to a breath test, like any other criminal offense, is subject to Arkansas law that guarantees the right to a jury trial unless that right is expressly waived.
Medlock v. State, 328 Ark. 229, 233, 942 S.W.2d 861, 863 (1997).
Although the version of Section -205 to which the court was referring in the above quoted statement has been amended several times, the section has not been removed from the criminal code, nor has its language been changed to refer to the act of refusal to submit as anything other than an "offense."
For these reasons, I conclude that formal criminal charges for refusal to submit under A.C.A. § 5-65-205 are permissible and, indeed, contemplated under Arkansas law.
Although the statutes do not specify particular criminal sanctions that can be imposed in addition to the administrative sanctions that are set forth in A.C.A. § 5-65-205, A.C.A. § 5-65-402, and elsewhere, see, e.g.,
A.C.A. § 5-65-104,[3] the general provisions of the criminal code on dispositions of offenders provide guidance.
As previously noted, refusal to submit appears to constitute a "violation," within the meaning of A.C.A. § 5-1-108. The criminal code prescribes the following disposition of "violations":
 (c) A defendant convicted of a violation may be sentenced to pay a fine:
 (1) Not exceeding one hundred dollars ($100) if the violation is defined by this code or defined by a statute enacted subsequent to January 1, 1976, that does not prescribe a different limitation on the amount of the fine; or
 (2) In accordance with limitations of the statute defining the violation, if that statute prescribes limitations on the amount of the fine.
A.C.A. § 5-4-201(d).
Thus, in addition to the administrative sanctions provided for in A.C.A. § 5-65-205 and A.C.A. § 5-65-402, a person who has committed the offense of refusal to submit under A.C.A. § 5-65-205 can be subject to the fine set forth above (in addition to the criminal sanctions that may be imposed for any related criminal offense, such as driving while intoxicated.
Assistant Attorney General Suzanne Antley prepared the foregoing opinion, which I hereby approve.
Sincerely,
MIKE BEEBE Attorney General
[1] I acknowledge that at first blush, this interpretation could be deemed problematic in the sense that, as interpreted, the "none shall be given" language of Section -205 essentially undermines the meaningfulness of "implied consent" as contemplated by Section -202. However, I believe that any problems associated with this interpretation are overridden by the practical effect of the sanctions that can be imposed for a driver's refusal to submit. I also acknowledge, in light of the apparent limitation of the permissible uses of the results of tests administered under Section -208, see Question 4, the seemingly counterintuitive conclusion that a warrant cannot issue for purposes of obtaining evidence for use in a criminal prosecution under Section -202, but that it could theoretically issue for purposes of Section -208.
[2] It is unclear whether the "implied consent" of A.C.A. § 5-65-202
constitutes valid consent in the Fourth Amendment context. Although the Arkansas Supreme Court has upheld, on the basis of implied consent, the denial of a Fourth Amendment motion to suppress the results of a blood alcohol test, see Mercer v. State, 256 Ark. 814, 510 S.W.2d 539 (1974), the court has more consistently held that mere acquiescence to a search does not constitute valid consent under the Fourth Amendment. See, e.g.,Stone v. State, 348 Ark. 661, 662, 74 S.W.3d 591 (2002). Nevertheless, "implied consent," because it is statutorily imposed, may rise to a level higher than mere acquiescence. This issue is unclear.
[3] For a discussion of the range of permissible administrative sanctions for refusal to submit, see Op. Att'y Gen. No. 2000-252.